AO106(Rev.5/85) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person, property, or premises to be searched)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*

WASHINGTON, D.C.

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

CASE NUMBER:

(Further described below)

I ___Christopher Fiorito_____ being duly sworn depose and say:

I am a(n)___Special Agent with the Federal Bureau of Investigation_____ and have reason to believe
(Official Title)

that  (name, description and or location)
The search site is located in the \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*.  It is described as a multi-family, two-story
dwelling with multi-colored vinyl siding \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*. The building is trimmed in \*\*\*\*\*,
the lower level is \*\*\*\*\*, and the top has \*\*\*\*\*\*\*\*\*\*\*.  The numbers \*\*\*\*\*\* are affixed to the front of the
building on \*\*\*\*\*\*\*\*\*\*\*\*\*.  \*\*\*\*\*\*\*\*\*\* is located on the \*\*\*\*\*\* level of the building and the \*\*\*\*\*\* level
is accessible by wood steps with a green metal railing and white support columns.  \*\*\*\*\*\*\*\*\*\* is also located
in the far \*\*\*\*\*\*\*\*\*\* of the \*\*\*\*\*\*\*\*\*\*\* and it has a \*\*\*\*\*\*\*\*.  The numbers \*\*\*\*\*\* are positioned on the
apartment's door under the peephole and the \*\*\*\*\*\*\*\*\*\* is affixed above the peephole for the apartment door.
in the District of Columbia, there is now concealed a certain person or property, namely (describe the person or property to be searched)
        See Attachment A

which is (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)
        Evidence of a crime

concerning a violation of Title 21 USC  United States Code, Section(s) 846 . The facts to support a finding of Probable
Cause are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN

Continued on the attached sheet and made a part hereof.    ☐  YES  ☒  NO

MATTHEW COHEN
OCNT                                    Signature of Affiant, Christopher Fiorito, Special Agent
(202) 514-7427                           Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence

                                        at Washington, D.C.

_____
Date

Alan Kay, United States Magistrate Judge
Name and Title of Judicial Officer         Signature of Judicial Officer

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**In re: Application for a Search Warrant**
**for the premises of:**

xxxxxxxxxxxxxxxxxxxxxx, WASHINGTON, DC

xxxxxxxxxxxxxxxxxxxxxxx, APARTMENT #1, WASHINGTON, DC

xxxxxxxxxxxxxxxxxxxxxxx, APARTMENT #3, WASHINGTON, D.C.

Xxxxxxxxxxxxxxxxxxxx WASHINGTON, DC

xxxxxxxxxxxxxxxxxxxxx, WASHINGTON, DC

xxxxxxxxxxxxxxxxxxxxx, APARTMENT 101, WASHINGTON, D.C.

  I, **Christopher Fiorito,** Special Agent (SA) with the Federal Bureau of Investigation (FBI), Washington Field Office (WFO), Washington, D.C. (hereinafter affiant), being duly sworn, depose and state as follows:

## I.  BACKGROUND AND EXPERIENCE

  1.  I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code (USC), Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 USC § 2516.

  2.  I have been a SA since 2002 and I have received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, homicide, gang, organized crime, drug and money laundering investigations, including the illegal structuring of financial transactions, surveillance techniques, asset forfeiture, unlawful importation, possession with intent to distribute and distribution of controlled substances; engaging in financial

transactions to promote, disguise or conceal illegal drug trafficking and the source of the proceeds derived from it, and unlawfully engaging in monetary transactions involving the proceeds of specified unlawful activity, practices commonly referred to collectively as "money laundering;" and conspiracies associated with the foregoing criminal offenses which are prohibited by 21 USC §§ 841(a)(1), 843(b), and 846,  and 18 USC §§ 922(g), 924©, 1956 and 1957.

3.      Your affiant is presently assigned to the Safe Streets Task Force in the Washington Field Office of the FBI in Washington, D.C.  This particular Task Force investigates violent street gangs and crews in Washington, D.C. in which most of the members are involved in the distribution of narcotics.

4.      Your affiant has been assigned to investigations involving the illegal possession, distribution, and/or manufacturing of controlled substances and has personally participated in the execution of numerous search and arrest warrants involving narcotics-related offenses.  During your affiant's tenure as a law enforcement officer, he has also interviewed and debriefed a number of individuals directly involved in the distribution of illicit drugs, including defendants, informants, cooperating witnesses, and others with personal knowledge of and experience in the purchase and sale of illicit drugs and the amassing, conversion, concealment, and disposition of the proceeds derived from such activity.  Your affiant has also participated directly in drug investigations utilizing court-authorized electronic surveillance, including wire interceptions.

5.      Through instruction and participation in investigations, your affiant has become familiar with the manner in which narcotics traffickers conduct their illegal business and the methods, language, and terms which are used to disguise conversations about their narcotics

2

activities. From experience and training, your affiant has learned, among other things, drug traffickers virtually never expressly refer to crack cocaine, powder cocaine, or other drugs by name, instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly innocent terms, that narcotics traffickers keep narcotics, narcotics related items and paraphernalia, money, firearms, and firearm related items in their residences, and/or their vehicles, and/or stash/storage locations, such as other apartments, garages, sheds and storage lockers. In addition, narcotics traffickers package their narcotics for sale in varying quantities. Ziploc baggies, small and large, are the packaging material of choice. Scales are often used to ensure the quantities are commensurate with price, as well as used to determine as accurately as possible, the varying amounts of the drugs being sold. Microwave ovens, pots, dishes, false bottom containers and other containers, cooking utensils, and cutting agents are also found in these locations, as they are often used to cook powder cocaine into crack cocaine. It is also common for narcotics traffickers to distribute from a specific location, to include stash houses, the residences of family members and associates, both witting and sometimes unwitting, and locations where other trusted associates of the trafficker are allowed access to, in order to protect the cache of drugs as well as the drug proceeds derived from the sale of these drugs. Such locations provide security for the trafficker, and it is a known location where customers go to obtain drugs. Further, your affiant knows from training and experience, that drug traffickers often use and retain firearms, and other weapons, to protect themselves, as well as to secure their cache of narcotics.

6.      Additionally, narcotics traffickers keep records of their trafficking activities to ensure they receive payment for the narcotics their customers purchase. These records may be in

3

written or electronic form. It is also common for narcotics traffickers to utilize multiple cellular telephones and pagers to facilitate communications, while concealing their true location, between themselves, their associates, their suppliers, their associates, customers and workers. In your affiant's training and experience, it is common for narcotics traffickers to utilize these telephones to ensue mobility, their relative security and their belief that law enforcement has difficulty intercepting the communications to and from these phones.  Narcotics traffickers often maintain books, records, receipts, notes, ledgers, money orders, bank records, money, safety deposit boxes and keys, telephone numbers, address books, numerous business cards, photographs, and other documentation relating to the transportation, ordering, sale and distribution of controlled substances. Your affiant is also aware that these items are generally maintained and retained in the drug trafficker's residence or the residence of a relative or associate where the drug dealer can quickly and easily access them and/or in the places of operation of the drug distribution activity, such as a stash house or safe house, or in a business location with which the trafficker is associated. Additionally, it is a common practice for drug dealers to utilize safes within their residences, or the residence of a confidante, relative or associate, in an effort to safeguard and more importantly,  conceal the  proceeds of their drug trafficking. It is also your affiant's experience that the individuals who possess and store firearms in their residences, vehicles and/or stash locations,  often store ammunition, shell casings, slugs, targets, holsters, gun cleaning kits and ownership papers.

7.       Through experience, your affiant knows that individuals involved in narcotics trafficking conceal within their residence, the residences of family members, friends and associates, in the places of operation of the drug distribution activity, such as a stash house or

4

safe house, or in a business location with which the trafficker is associated, large amounts of currency, financial instruments, precious metals, jewelry and other items of value, and or proceeds of financial transactions relating to obtaining, transferring, secreting or spending large sums of money made from engaging in narcotics trafficking within their residences, offices and businesses, garages, storage buildings, automobiles, and safety deposit boxes.

8.    Based upon your affiant's knowledge, training, and experience, and participation in numerous other investigations involving cocaine base, powder cocaine and other controlled dangerous substances, your affiant also knows that:

(a)    Individuals who deal in the sale and distribution of controlled substances commonly maintain addresses and telephone number books or papers which reflect names, addresses and/or telephone numbers for their associates in their illegal organization. These individuals often utilize cellular telephones, pagers and telephone systems to maintain contact with their associates in their illegal businesses. These telephone records, bills and pager numbers are often found in their place of residence, or the residence of family members, friends or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

(b)    Individuals who deal in illegal controlled substances often take photos of themselves, their associates, their property and illegal contraband. These photos are usually maintained in their place of residence, or the residences of family members, friends or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

©    Persons who traffic controlled substances maintain documents, letters and records

5

relating to illegal activity for long periods of time.  This documentary evidence is usually secreted in their residence, or the residences of family members, friends or associates, in their businesses, or in the places of operation of the drug distribution activity, such as a stash house or safe house. This documentary evidence includes but is not limited to telephone numbers, telephone books, address books, credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, accounts and records in fictitious names, false identification, money orders, cashiers checks relating to cash transactions and records indicating the existence of storage facilities used in narcotics trafficking.

(d)      Individuals involved in narcotics trafficking often own, possess and/or use weapons as a means to facilitate their illegal drug activities. Such weapons are most often secreted in their residence, or the residences of family members, friends or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

(e)      That it is common to maintain and store the aforementioned evidence of narcotics trafficking  crimes on electronic storage devices, including computers, mobile or cellular telephones, pagers, personal digital assistants (PDAs), handheld computers, MP3 players, digital hard drives, including, but not limited to IPODS and external storage drives; and the media to store information, including diskettes, tapes or data storage devices.

9.      As part of my current assignment, I have been investigating the narcotics organization discussed herein, a violent street crew which controls several blocks in Southeast Washington, D.C.   This criminal organization is headed by JAMES LAMONT BECTON and his brother, WILLIE LATRELL BEST. This organization controls a small, but significant area of

6

southeast D.C., specifically including, but not limited to the 4200 and 4300 blocks of Fourth Street, SE.

10.    Information provided in this affidavit is based upon the affiant's personal knowledge and/or information obtained from other law enforcement personnel, confidential sources and databases containing intelligence.

## II.    RELEVANT CRIMINAL HISTORIES

11.    During the course of this investigation, the following individuals, among others, have been identified as being involved in a conspiracy to distribute and possess with intent to distribute crack cocaine, powder cocaine and ecstacy:  James Lamont Becton, also known as Pumpkin, also known as P, also known as Funk;  Willie Latrell Best, also known as Fat Boy;  Frederick Harold Mercer, also known as Fred, also known as Freaky; Carolyn Romaine Becton Moody; Shannon Marie Best, also known as Big Face; Jaquan Best, also known as Wop, also known as Quan; Russell Lyne Ramseur, Jr., also known as Squirt; Gina Elise Taylor;  Deborah Denise Jones; Keith Jeremiah Sampler, also known as Son Son; Rubin Alfonzo Butler, also known as Buster; Martin Lewis, also known as Albert Blandshaw, also known as Al; Miah Jackson, also known as White Girl, also known as Red Girl; Tyrone Pierre Washington, also known as T-Rock, also known as T-Y; Christopher Lee Becton, also known as Rock; Michael Eugene Fleming, also known as White Mike; Johnny Deandre Hodge, also known as Dre, also known as Dirty; Robert Chase, also known as Uncle Rock;  Anthony Hyman, also known as Mook; Jaron Evans, also known as Lips; Bernard Briggs, also known as Heavy; Derrick Miller, also known as Reds; and Benita Lavell Worthy.

12.    The following criminal histories have been obtained for these persons:

(a) JAMES LAMONT BECTON, a/k/a Pumpkin, a/k/a P, aka Funk, is a black male born

on xxxxxxxxxxxxxx, with a Social Security Number of xxxxxxxxxxx.  He has the following

criminal history (xxxxxxxxxxxxxxxxx)

| Date of Arrest | Charges | Location | Disposition |
| --- | --- | --- | --- |
| 03-25-1992 | Possession of a Prohibited Weapon, Class A, Etc | Washington, DC | Disposition Unknown |
| 04-03-1992 | Uniform Controlled Substance Act | Washington, DC | Disposition Unknown |
| 04-17-1993 | Assault with a Dangerous Weapon-Criss - Cross | Washington, DC | Disposition Unknown |
| 01-30-1995 | Murder I While Armed; Murder II, Manslaughter; PFCV; CPWL | Washington, DC | 06-09-1997 Counts 1-4, Not Guilty; Count 5 40-120 months |
| 06-05-1995 | 01-27 616 Murder; 02-27-616 Murder; 03-27 489 Robbery w/Dang & Dead; 04-27 29 Burglary Generally; 05-27 30 Burglary INT/STEAL/NI; 06-27 36B Handgun Wear/Carry; 08-27 7348A Car jacking; 09-27 286 CDS Unlawful Mfg. ETC | Baltimore Co PD | 03-09-1998 Not Guilty Counts 1-4, 6&7, Nolle Prosequi Counts 5,8&9 |
| 11-16-1995 | Murder I While Armed | Washington, DC | 06-03-1996 Dismissed/With Prejudice |
| 08-19-1999 | CPWL | Washington, DC | 30-90 months |

| Date of Arrest | Charges | Location | Disposition |
|---|---|---|---|
| 04-25-2001 | UCSA PWID Cocaine | Washington, DC | Dismissed |
| 06-17-2003 | UCSA PWID Cocaine | Washington, DC | 2 Years, 3 years suspended |

(b) WILLIE LATRELL BEST is a black male born on xxxxxxxxxxxxx, with a Social Security Number of xxxxxxxxxxxxxxxThe following criminal history was located for BEST (xxxxxxxxxxxxxxxxx)

| Date of Arrest | Charge | Location | Disposition |
|---|---|---|---|
| 10-04-1994 | Assault with a Dangerous Weapon Gun; CPWL; UF; UA | Washington, DC | 03-14-1995, 6 years; 3 years Youth Rehabilitation Act |
| 01-13-1995 | Felony Bench Warrant; Bail Reform Act; UCSA PWID Cocaine | Washington, DC | 1-13-1995 Guilty Possession of Cocaine, 5 Years |
| 11-15-1995 | Murder I While Armed | Washington, DC | Disposition Unknown |
| 12-19-1995 | Failure to Appear | USM Akron, OH | Disposition Unknown |
| 09-02-1998 | UCSA Possession of Marijuana | Washington, DC | 09-03-1998 No Paper |
| 03-02-1999 | UCSA PWID Cocaine-Crack USCA PWID Marijuana | Washington, DC | 05-03-1999 DWP |
| 07-04-1999 | Receiving Stolen Property | Washington, DC | Disposition Unknown |

| Date of Arrest | Charge | Location | Disposition |
|---|---|---|---|
| 08-12-2003 | False Statements to Officer | Edmonston PD, MD | 10-03-2003 Failure to Appear |
| 08-29-2003 | CPWL; Unregistered Ammo | Washington, DC | Disposition Unknown |
| 01-15-2004 | PWID - Cocaine | Washington, DC | No papered |
| 08-18-2004 | USCA Distribution of Cocaine | Washington, DC | Disposition Unknown |
| 12-20-2004 | Assault & Battery - Family Member | Alexandria, VA | 02/07/2005 Guilty; Misdemeanor 10 days suspended |
| 10-14-2004 | Conspiracy to Traffic in Cocaine; Two counts in Trafficking in Cocaine | Smithfield, NC | 11/5/2004 Dismissal without Leave |

© FREDERICK HAROLD MERCER, a/k/a Fred, is a black male born on

xxxxxxxxxxxxxx, with a Social Security Number of xxxxxxxxxxx. The following criminal

history was located for MERCER (xxxxxxxxxxxxxxxx):

| Date of Arrest | Charges | Location | Disposition |
|---|---|---|---|
| 06-07-1992 | AWIR/ Destruction of Property | Washington, DC | Dismissed 07-07-1992 |
| 08-02-1992 | Simple Assault | Washington, DC | DWP 03-17-1993 |
| 12-02-1993 | Unauthorized Use of Vehicle | Washington, DC | No papered |
| 11-19-1993 | Burglary/Theft Less than $300 | Prince George's County, MD | Nolle prosequi |
| 09-24-1994 | Felony Possession of Cocaine | Clinton, NC | Dismissal w/o leave |
| 02-11-1995 | Armed Robbery Gun | Washington, DC | 5-15 years adult incarceration |

| Date of Arrest | Charges | Location | Disposition |
| --- | --- | --- | --- |
| 06-06-2001 | Armed Robbery | FCI-Edgefield | Unknown |
| 05-13-2003 | PWID-Cocaine | Washington, DC | No papered |
| 10-23-2003 | Violation/ Drugs | Rivers FCI | Unknown |
| 05-23-2006 | PWID - Crack Cocaine | Prince George's County, Maryland | No Papered |
| 09-11-2006 | Parole Violation | Washington, DC | 6 months confinement |

(d) CAROLYN ROMAINE BECTON MOODY is a black female born on xxxxxxxxxxxxxxxxx, with a Social Security Number of xxxxxxxxxxx. She has the following criminal history (xxxxxxxxxxxxxxxx)

| Date of Arrest | Charges | Location | Disposition |
| --- | --- | --- | --- |
| 07-07-1985 | Petty Theft | Prince George's County, MD | 02-18-1986 Guilty, sentence - 1 day |
| 03-21-1993 | Simple Assault; Assault with a Dangerous Weapon-Bottle | Washington, DC | Disposition Unknown |

(e) SHANNON MARIE BEST, a/k/a Big Face, is described as a black female born on xxxxxxxxxxxxxxxxx, with a Social Security Number of xxxxxxxxxxx. She has no criminal history and no FBI number.

(f) JAQUAN BEST, a/k/a Wop, is described as a black male born on xxxxxxxxxxxxxxxx, with the Social Security Number of xxxxxxxxxxx and xxxxxxxxxxx used. He has the following criminal history (xxxxxxxxxxxxxxxx):

| Date of Arrest | Charges | Location | Disposition |
|---|---|---|---|
| 08-22-2002 | Tresspass/FTA | Prince George's County, MD | Unknown |
| 10-10-2002 | Theft >$500 | Prince George's County, MD | Nolle Prossed |
| 12-02-2003 | PWID/While Armed Carrying a gun | Prince George's County, MD | Guilty of PWID While Armed/other charges Nolle Prossed |
| 01-25-2006 | False Statements | Prince George's County, MD | Pending |

(g) RUSSELL LYNE RAMSEUR, Jr., a/k/a Squirt, is described as a black male born on xxxxxxxxxxxxx, with a Social Security Number of xxxxxxxxxxxxxxx has the following criminal history (xxxxxxxxxxxxxxx):

| Date of Arrest | Charges | Location | Disposition |
|---|---|---|---|
| 06-20-1994 | Robbery While Armed/PWID-Cocaine | Washington, DC | Disposition Unknown |
| 06-26-1995 | PWID - Cocaine | Washington, DC | Guilty Plea; 1Y probation/ drug testing |
| 10-30-1995 | ADW- Shod Foot | Washington, DC | Nolle Prosequi |
| 12-18-1995 | Fugitive from Justice | Washington, DC | Disposition Unknown |
| 12-20-1995 | Robbery/DW | Upper Marlboro, MD | Disposition Unknown |
| 06-18-1996 | Robbery/DW | Washington, DC | Disposition Unknown |

| 12-14-1999 | Armed Robbery | Washington, DC | 5 Years/ESS 2 Years/3Years probation |
| 12-31-2003 | Violation of Parole/Armed Robbery | Baltimore, MD | Sentenced to do remainder of sentence |

(h) KEITH JEREMIAH SAMPLER, a/k/a Son Son, is described as a black male, born on xxxxxxxxxxxxxx, with a Social Security Number of xxxxxxxxxxx.  He has the following criminal history (xxxxxxxxxxxxxxx):

| Date of Arrest | Charge | Location | Disposition |
| --- | --- | --- | --- |
| 04-01-2003 | Distribution of Cocaine | Washington, D.C. | Unknown |
| 07-08-2005 | No charge listed | Prince George's County, Maryland | Turned over to Commissioner |
| 05-10-2006 | Possession of Marijuana; Possession of Drug Paraphernalia; No Permit | Washington, D.C. | Unknown |
| 12-04-2006 | Possession With Intent to Distribute - Crack Cocaine; CPWL; Unregistered Ammunition; Unregistered Firearm | Washington, D.C. | Unknown |

(I)      RUBEN ALFONZO BUTLER, a/k/a Buster, is described  as a black male, born on xxxxxxxxxxxxxxxxx with a Social Security Number of xxxxxxxxxxx.  He has the following criminal history (NO FBI# located):

13

| Date of Arrest | Charge | Location | Disposition |
|---|---|---|---|
| 10-30-2006 | Unauthorized Use of Vehicle | Washington, D.C. | Pending |
| 03-14-2007 | Bail Jumping Possession of Marijuana | Washington, D.C. | No papered |

(j)     CHRISTOPHER LEE BECTON, a/k/a Rock, is described as a black male, born on xxxxxxxxxxxxxxxxx, with a Social Security Number of xxxxxxxxxxx. He has  the following criminal history (xxxxxxxxxxxxxxxx):

| Date of Arrest | Charges | Location | Disposition |
|---|---|---|---|
| 02-02-1993 | Felony Threats | Washington, D.C. | Nolle Prossed |
| 07-13-1994 | Assault With A Deadly Weapon | Washington, D.C. | No Papered |
| 08-01-1994 | Simple Assault | Washington, D.C. | No Papered |
| 10-04-1994 | CPWL; Unregistered Firearm; Unregistered Ammunition | Washington, D.C. | Unknown |
| 01-13-1995 | Felony Bench Warrant/Bail Reform Act/PWIID- Cocaine | Washington, D.C. | Guilty- PWID Cocaine 5 years |
| 12-19-1995 | Failure to Appear | Akron, Ohio | Unknown |
| 09-02-1998 | Possession of Marijuana | Washington, D.C. | No Papered |
| 02-25-1999 | Marijuana While Armed/PWID Unregistered Ammunition/ Unregistered Firearm/Driving Under the Influence | Washington, D.C. | Unknown |

| 08-29-2003 | CPWL/Unregistered Ammunition | Washington, D.C. | Not Guilty |
| 08-18-2004 | Distribution of Cocaine | Washington, D.C. | No Papered |

(l)    GINA TAYLOR is described as a black female, born on xxxxxxxxxxxx, with a Social Security Number of xxxxxxxxxxx. She has no criminal history and no FBI number.

(m)    DEBORAH DENISE JONES is described as a black female, born on xxxxxxxxxxxx, with a Social Security Number of xxxxxxxxxxx. She has the following criminal history (xxxxxxxxxxxxxxx):

| Date of Arrest | Charges | Location | Disposition |
| --- | --- | --- | --- |
| 2002 | FTA/Traffic Offense | Prince George's County, Maryland | Dismissed |
| 06/2003 | Disorderly Conduct | Baltimore, Maryland | Dismissed |
| 01-15-2004 | PWID- Cocaine | Washington, D.C. | No papered |
| 10-14-2004 | Conspiracy to Traffic in Cocaine and Trafficking in Cocaine | Smithfield, North Carolina | No papered |

(n)    MARTIN LEWIS, a/k/a ALBERT BLANDSHAW, a/k/a Al, is described as a black male, born on xxxxxxxxxxxxxxxxxx, with a Social Security Number of xxxxxxxxxxxxxxxxxxxxxxxxxx, and xxxxxxxxxxx (all used): LEWIS has the following criminal history:  (Xxxxxxxxxxxxxxx):

| Date of Arrest | Charges | Location | Disposition |
|---|---|---|---|
| 12-15-1982 | Narcotics Violation; Disorderly Conduct; Criminal Possession of Weapon | New York, NY | Pled Guilty- Sentenced to a Fine and Custody  Bench Warrant issued |
| 02-22-1984 | Possession of Marijuana and Criminal Sale of Marijuana | New York, NY | Pled Guilty - Sentenced to fine and Custody - Bench Warrant issued |
| 09-30-1984 | Criminal Possession - Marijuana and Weapon | New York, NY | Pled Guilty |
| 01-07-1987 | Possession With Intent to Distribute - Cocaine | Alexandria, Va | 3 years confinement/5 years probation |
| 03-26-1987 | Carrying a Pistol Without a License; Unregistered Pistol and Ammunition | Washington, DC | CNTS for Disposition and Sentence Unknown - $100 fine and 30 days |
| 02-14-1992 | Possession of Marijuana | Baltimore, Maryland | Unknown |
| 06-07-1996 | Possession With Intent to Distribute - Cocaine | Baltimore, Maryland | One year FR |
| 04-10-1997 | PWID- Cocaine | Baltimore, Maryland | One year |
| 12-07-1999 | PWID- Cocaine | Baltimore, Maryland | Unknown |
| 11-12-2000 | FTA | Baltimore, Maryland | Unknown |
| 08-24-2001 | PWID- Cocaine; Simple Assault | Washington, DC | Unknown |
| 05-15-2005 | Possession of Marijuana | Baltimore, Maryland | Unknown |
| 02-17-2005 | Simple Assault | Washington, D.C. | Nolled |

(o)    MIAH ANGELA JACKSON is described as a black female, born on

xxxxxxxxxxxxx, with a Social Security Number ofxxxxxxxxxxxx,xxxxxxxxxxxx,  and

xxxxxxxxxxxx (all used).  She has the following criminal history (xxxxxxxxxxxxxxx):

| Date of Arrest | Charges | Location | Disposition |
|---|---|---|---|
| 03/07/1994 | Misdemeanor Larceny | Arlington, Virginia | Not Received |

(p)    ANTHONY PATRICK HYMAN, also known as Mook,   is described as a black

male, born on xxxxxxxxxxxxxxx, with a Social Security Number of xxxxxxxxxxx and

xxxxxxxxxxxx  (both used).  He has the following criminal history (xxxxxxxxxxxxxxx):

| Date of Arrest | Charges | Location | Disposition |
|---|---|---|---|
| 12-01-2003 | Assault in Second Degree | Prince George's County, Maryland | Turned Over to Commissioner/Nolle Prosequi (4/2004) |
| 09-24-2004 | Bail Bond/Hearing | Prince George's County, Maryland | Held |
| 09-25-2004 | Bail/Bond Hearing | Prince George's County, Maryland | Released/Bail |
| 10-22-2004 | Possession of Controlled Substance with Intent to Distribute; Possession of Controlled Substance; Firearm During a Drug Transaction; Transport a Handgun; Carry a Handgun; Possession of a Firearm with Serial # | Prince George's County, Maryland | Nolle Prosequi on Counts 2,3,5,6 Guilty on Count 4, Transporting a Handgun- Sentenced to 3 years, suspended 2 years 10 months, 2 years received |

| 08-03-2005 | Possession of Marijuana | Washington, D.C. | Convicted; Sentenced to Probation with Judgement; Supervised 12 months |
|---|---|---|---|
| 09-08-2005 | Fugitive from Justice | Washington, D.C. | TOT Charles County, Maryland |
| 10-20-2005 | Reckless Endangerment | Prince George's County, Maryland | Nolle Prosequi |
| 09-13-2005 | Vehicle Rented; Failure to Return; Motor Vehicle, Unlawful TA Theft Over $500.00 | Charles County, Maryland | Released to another Agency |
| 11-25-2005 | PWID- Marijuana and Possession of Open Alcohol Container | Washington, D.C. | Unknown |
| 01-13-2006 | PWID- Marijuana While Armed; Bench Warrant - FTA (x2) | Washington, D.C. | Unknown |
| 06-05-2006 | Handgun in Vehicle; Handgun on Person; Possession With Intent to Distribute; Possession of Marijuana; Distribution of ETC with Firearm | Prince George's County, Maryland | Released to another Agency |
| 10-19-2006 | Failure to Appear | Prince George's County, Maryland | Probation |
| 12-20-2006 | Failure to Appear | Prince George's County, Maryland | Probation |

(q)    TYRONE PIERRE WASHINGTON is a black male born on

XXXXXXXXXXXXXXXXXX, with a Social Security Number of XXXXXXXXXXX.  The

18

following criminal history was located for WASHINGTON (xxxxxxxxxxxxxx):

| Date of Arrest | Charge | Location | Disposition |
|---|---|---|---|
| 12-17-1995 | Armed Robbery - Handgun | Upper Marlboro, MD | Disposition Unknown |
| 09-10-1998 | UCSA Possession of Marijuana | Washington, DC | Disposition Unknown |
| 01-15-1999 | UCSA Possession of Marijuana | Washington, DC | Disposition Unknown |
| 01-19-1999 | Assault on Police Officer | Washington, DC | Nolle Pros |
| 04-27-1999 | Possession of Marijuana | Washington, DC | Case Dismissed |
| 04-27-1999 | PWID Crack Cocaine | Washington, DC | Case Dismissed |
| 02-18-2000 | UCSA PWID Cocaine | Washington, DC | Disposition Unknown |
| 02-18-2000 | UCSA PWID Marijuana | Washington, DC | 10/12/2000 1year jail time weekends, $100 Fine, 1yr prob |
| 11-08-2000 | Attempt to receive stolen property | Washington, DC | Nolle Pros |
| 11-08-2000 | No Permit | Washington, DC | Nolle Pros |
| 02-04-2001 | Prison Breach | Washington, DC | Disposition Unknown |
| 06-14-2001 | Receiving Stolen Property | Washington, DC | No Papered |
| 10-13-2001 | Unauthorized use of Vehicle - Driver | Washington, DC | Sentenced to 140D, Probation Revoked |
| 10-01-2003 | UCSA Dist Cocaine | Washington, DC | Disposition Unknown |
| 12-21-2003 | Fugitive From Justice | Washington, DC | Sentenced to 6 Months |

19

| Date of Arrest | Charge | Location | Disposition |
|---|---|---|---|
| 06-16-2004 | Contempt | Washington, DC | Sentenced to 6 Months |
| 03-10-2005 | Parole Violation | Washington, DC | Disposition Unknown |
| 06-23-2005 | DC SRAA Drug Use, Fail to Rpt, Contempt | Washington DC | 12 Months |
| 04-06-2007 | UCSA Poss Drug Paraphernalia | Washington, DC | Disposition Unknown |

® ROBERT LINCOLN CHASE is a black male born on xxxxxxxxxxxxx with a Social Security Number of xxxxxxxxxxx. The following criminal history was located for CHASE (xxxxxxxxxxxxx):

| Date of Arrest | Charge | Location | Disposition |
|---|---|---|---|
| 12-13-1980 | Uniform Narcotics Act - Marijuana | Washington, DC | Disposition Unknown |
| 02-14-1984 | UCSA Cannabis | Washington, DC | Disposition Unknown |
| 03-21-1984 | UCSA Cannabis | Washington, DC | Pled Guilty |
| 03-21-1984 | PWID | Washington, DC | Nolle Pros |
| 09-15-1984 | UCSA | Washington, DC | Charge Dismissed |
| 04-10-1985 | UCSA | Washington, DC | DWP |
| 03-10-1986 | UCSA Two Counts | Washington, DC | Nolle Pros |
| 11-10-1986 | UCSA-PCP Distribution | Washington, DC | 20 Months to 5 Years Confinement. |
| 02-02-1992 | Simple Assault | Washington, DC | Unknown |
| 05-20-1993 | UCSA | Washington, DC | Nolle Pros |
| 05-20-1993 | PWID Cocaine | Washington, DC | Nolle Pros |

| Date of Arrest | Charge | Location | Disposition |
|---|---|---|---|
| 08-04-1984 | Assault w/ a Deadly Weapon | Washington, DC | Case Dismissed |
| 03-12-1998 | UCSA PWID Cocaine | Washington, DC | 4-12 Years CSS all 4 years probation w/ drug testing. |

(s)     JOHNNY DEANDRE HODGE  is a black male born on xxxxxxxxxxxxx, with a Social Security Number of xxxxxxxxxxx.  The following criminal history was located for HODGE (xxxxxxxxxxxxxxx)

| Date of Arrest | Charge | Location | Disposition |
|---|---|---|---|
| 09-29-1994 | Assault on Police Officer | Washington, D.C. | 09-30-1994 No Paper |
| 02-14-1996 | PWID Cocaine; Carrying pistol w/out license; unregistered ammo; possession firearm | Washington, D.C. | 11-15-1996 18-54 months |
| 04-11-1996 | Carrying Pistol w/out Lic; UCSA Poss marijuana; Unregistered Ammo; Hit & Run | Washington, D.C. | Unknown Disposition |
| 04-11-2001 | Unauthorized Use of Vehicle | Washington, D.C. | Unknown Disposition |
| 09-21-2001 | CDS: Poss Marijuana | College Park, MD | Unknown Disposition |
| 04-17-2002 | Disorderly Conduct | PG County PD | Nolle Pros |
| 01-03-2004 | Carrying Pistol w/out Lic; AUCSA Poss marijuana | Washington, D.C. | Unknown Disposition |

| Date of Arrest | Charge | Location | Disposition |
|---|---|---|---|
| 01-19-2004 | Reckless Endangerment; Child Abuse; Unattended Child; Assault 2nd | Maryland | Nolle Pros |
| 05-12-2004 | Assault 2nd | PG County Sheriff's | Nolle Pros |
| 08-19-2004 | Child Abuse; Reckless Endangerment; Confinement Neglect; Assault 2nd | 7th Judicial Circuit, MD | 03-21-2005 2 Yrs incarceration; 1 yr, 10 months suspended; 1 yr, 6 months probation |
| 01-27-2005 | Murder 1st; Assault 1st; Assault 2nd; Assault 2nd; Reckless Endangerment; Handgun in Vehicle; Handgun on Person; Vandalism | PG County Sheriff's Office | Bound Over for Trial |
| 02-22-2005 | Assault 1st; Assault 2nd; Reckless Endangerment; Use of Handgun; Assault 2nd; Assault 2nd; Assault 2nd; Vandalism | 7th Judicial Circuit Court, MD | 03-21-2005 Found Guilty of Assault 2nd, sentenced: 2 yrs incarceration, 1 yr, 10 months suspended; 1 yr, 6 months probation |
| 07-29-2005 | UCSA Crack cocaine X 4; UCSA Crack cocaine X 1 | Washington, D.C. | Pled guilty to 3 counts of Distribution; 1 year supervised probation, 3 mos. HWH concurrent |
| 01-03-2007 | Assault 2nd; Resisting Arrest | PG County | Unknown Disposition |

(t)    DERRICK GERMAINE MILLER  is a black male born on xxxxxxxxxxxxxxxx,

with a Social Security Number of xxxxxxxxxxx.  A source who has provided reliable

information in the past indicated that MILLER currently resides with SHANNON BEST.  The

following criminal history was located for MILLER (xxxxxxxxxxxxxx):

| Date of Arrest | Charge | Location | Disposition |
| --- | --- | --- | --- |
| 01-01-1989 | Robbery | Prince Georges County, MD | Guilty, 05 Years Suspended, 01 Months, Probation 03 years. |
| 06-05-1991 | Assault with intent to murder | Prince Georges County, MD | Nolle Pros |
| 08-20-1994 | Assault with intent to kill while armed. | Washington, DC | Dismissed |
| 08-20-1994 | Carrying a pistol without a license | Washington, DC | Dismissed |
| 12-13-1994 | Carrying a Pistol without a license | Washington, DC | Motion Started, Co-Def Dismissed |
| 03-19-1996 | CSA Cocaine | Washington, DC | Unknown Disposition |
| 03-19-1996 | Unlawfully distribute 50 grams or more cocaine base | Washington, DC | Time Served, 4 Years supervised release. |

(u)    MICHAEL EUGENE FLEMING, JR., also known as White Mike, is described as

a black male, born on xxxxxxxxxxxxxx, with a Social Security Number of xxxxxxxxxxx.  He

has the following criminal history (xxxxxxxxxxxxxx):

| Date of Arrest | Charges | Locations | Disposition |
| --- | --- | --- | --- |
| 07-23-1997 | Possession of Paraphernalia | Prince George's County, Maryland | Released to Another Agency |

(v)    JARON RADELL EVANS, also known as LIPS, is described as a black male,

born on xxxxxxxxxxxxxxxxx, with no Social Security Number recorded.   He has the following

criminal history (xxxxxxxxxxxxxxxxx).

| Date of Arrest | Charges | Location | Disposition |
| --- | --- | --- | --- |
| 06-04-2006 | Possession of Marijuana | Washington, D.C. | No Papered 06/13/2006 |
| 10-03-2006 | Obstructing Justice | Arlington, Virginia | Nolle Prossed |
| 10-03-2006 | Eluding Police-Endangerment Persons or Police with car | Arlington, Virginia | Not Received |
| 10-03-2006 | Felony Hit and Run | Fairfax County, VA | Nolle Prossed |

(w)    BERNARD BRIGGS, also known as HEAVY, is described as a black male, born

on xxxxxxxxxxxxxx with a Social Security Number of xxxxxxxxxxx.  He has the following

criminal history (xxxxxxxxxxxxx):

| Date of Arrest | Charges | Location | Disposition |
| --- | --- | --- | --- |
| 01-29-1992 | Distribution Crack Cocaine | Washington, D.C. | Disposition Unknown |
| 07-13-1992 | UNIF Controlled Substance Act Distribution of Cocaine | Washington, D.C. | 5-19-1993 Dismissed |
| 09-12-1992 | Felony Bench Warrant Fugitive From Justice | Washington, D.C. | 05-18-1993, Guilty of Bra Sup Prob |
| 03-23-1997 | Theft One, USW | Washington, D.C. | 7-17-1997 DWP |
| 05-23-2006 | AUCSA Possession Cocaine (Crack) | Washington, D.C. | 05-24-2006, No Paper. |

| Date of Arrest | Charges | Location | Disposition |
|---|---|---|---|
| 05-06-2007 | 1855 UCSA Possession Drug Paraphernalia | Washington, D.C. | Disposition Unknown |

(x)    BENITA LAVELL WORTHY is described as a black female, born on xxxxxxxxxxxxxxx, with a Social Security Number of xxxxxxxxxxx. She has no criminal history and no FBI Number.

(y)    DAMIEN ANDRETELL THOMPSON is described as a black male, born on xxxxxxxxxxxxxxxxxx and xxxxxxxxxxxxxxxxxx (both used)  with a Social Security Number of xxxxxxxxxxx and xxxxxxxxxxx (both used).  He has the following criminal history (xxxxxxxxxxxxxxxx):

| Date of Arrest | Charges | Location | Disposition |
|---|---|---|---|
| 10-02-1997 | Disturbing the Peace/Failure to Obey a Lawful Order | Landover, Maryland | Unknown |
| 03-12-1999 | Theft Over $300 | Landover, Maryland | Unknown |
| 02-29-2000 | FTA- Theft $300 Plus | Landover, Maryland | Unknown; $10,000 |
| 03-13-2001 | Possession of Controlled Substance | Landover, Maryland | Unknown |
| 05-17-2005 | PWID - Cocaine | Washington, D.C. | Pled Guilty |
| 05-24-2006 | CPWL; Unregistered Firearm; Unregistered Ammunition ; Possession of Marijuana | Washington, D.C. | No Papered |

## III.    LONG TERM NARCOTICS CONSPIRACY

13.    Your affiant's investigation revealed that JAMES LAMONT BECTON, a/k/a Pumpkin, also known as  P, also known as Funk; WILLIE LATRELL BEST,  also known as  Fat Boy; FREDERICK MERCER, also known as  Fred, also known as  Freaky; CAROLYN ROMAINE BECTON MOODY, SHANNON BEST, also known as  Big Face; JAQUAN BEST, also known as  Wop, also known as  Quan; TYRONE WASHINGTON, also known as  T-Y, also known as  T- Rock; RUSSELL LYNE RAMSEUR, also known as  Squirt; GINA ELISE TAYLOR, DEBORAH  DENISE JONES, KEITH JEREMIAH SAMPLER, also known as  Son Son; RUBIN ALFONZO BUTLER, also known as  Buster; MARTIN LEWIS, also known as Al, also known as Albert Blandshaw; MIAH JACKSON, also known as  White Girl, also known as  Red Girl; CHRISTOPHER LEE BECTON,  also known as  Rock; MICHAEL FLEMING, also known as  White Mike; JOHNNY DEANDRE HODGE, also known as  Dre, also known as Dirty;  ROBERT CHASE, also known as  Uncle Rock, and others, have engaged in a long-term conspiracy, and are continuing to engage in an on-going conspiracy, to distribute and possess with the intent to distribute cocaine base (also known as crack), cocaine, and other controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846), use, carry, and possess firearms in furtherance of drug trafficking offenses, in violation of 18 U.S.C. § 924©, and commit money laundering, in violation of 18 U.S.C. §§ 1956 and 1957.  This conclusion is derived from various sources of intelligence, to include confidential sources, controlled purchases of illegal narcotics, physical surveillance and intercepted communications obtained during judicially authorized wiretaps.

26

A.     **CONFIDENTIAL SOURCE INFORMATION**

Confidential Source Number One

14.     Confidential Source Number One (hereinafter referred to as "S-1") began cooperating with the FBI In January of 2005.  S-1 also has an extensive criminal history and is working with the government pursuant to a cooperation agreement.  S-1 has not been paid for the assistance it has provided in connection with this investigation and S-1 is not presently incarcerated.

15.     S-1 has provided reliable information concerning JAMES BECTON, WILLIE BEST, FREDERICK MERCER, CHRISTOPHER LEE BECTON, TYRONE WASHINGTON, JAQUAN BEST and other members of this narcotics enterprise, as well as other significant narcotics traffickers in the southeast quadrant of the District of Columbia.  S-1's information has been corroborated by other sources of information, evidence gathered during this investigation, and other investigations conducted by the FBI.  S-1 has never been known to provide false information.

16.      According to S-1, S-1 has had a personal relationship with WILLIE BEST, JAMES BECTON, and FREDERICK MERCER, and has known them for many years.  Moreover, BECTON and BEST are brothers, they are long-time drug traffickers, and they are the main suppliers of crack cocaine to various co-conspirators within their drug network.  S-1 stated that it began purchasing drugs from BEST and his crew in the late 1990s, and S-1 purchased as much as kilogram (1000 gram) quantities of cocaine from BEST, most recently in 2005.

17.     S-1 identified MERCER, BECTON, and others as being involved in drug trafficking with BEST.  S-1 knows that MERCER sells cocaine for BEST and BECTON in

27

several courts located in the xxxxxxxxxxxxxxxxxxxx of xxxxxxxxxxxxxt, SE, Washington, D.C.
S-1 has seen MERCER sell drugs out of his vehicle and during hand-to-hand transaction and on
at least one occasion in 2005, S-1 purchased approximately 66 grams of powder cocaine from
MERCER in Washington, D.C. metropolitan area.  S-1 also observed MERCER in possession of
a significant amount of powder cocaine, which MERCER cooked into crack cocaine, in 2005.

18.    S-1 stated that BEST and BECTON are very close, with BEST preferring to
maintain a low profile and BECTON being more "flashy" and getting the latest in cars, clothes
and entertainment.  S-1 knows that BECTON oversees the drug sales which occur in the xxxx
and the xxxx blocks of xxxxxxxxxxxxx, SE, D.C.  S-1 knows that for a time, BECTON was
storing drugs at xxxxxxxxxxxxxxxxxxxxxxx, Apartment #7.   This apartment was the residence
of one of BECTON's baby's mothers.

19.    S-1 knows that in 2004 BEST got arrested in North Carolina for a controlled
substance violation with a female and one of BEST's cousins.  According to S-1, once BEST
returned to the D.C. area, he told S-1 that he was not going to be making the trips for drugs any
more and that he did not trust anyone after this incident.  Your affiant confirmed that in October
of 2004, BEST and two individuals were stopped by the North Carolina State Highway Patrol in
Johnson County, North Carolina. BEST and another person were stopped in one vehicle and a
third person was stopped driving a rental vehicle.  Pursuant to the traffic stop of both vehicles, a
canine search of the vehicle driven by the third person yielded four kilograms of cocaine and
documents in the name of BEST in the rental car driven by the third party.  All three suspects
were arrested in North Carolina at that time and charges against BEST and the companion in his
car were ultimately dismissed.

28

20.     Also according to S-1, BEST, BECTON, and MERCER have based their drug operation in the xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx Street, SE, D.C., and just north of the Maryland State line from 1998 to the present.  This area, the xxxxxxxxxxxxxxxxxxxxxxxxxxxx, SE, is referred to by BEST and his crew members as the "pit" or the "hole" and S-1 has personally seen BECTON in the second court of the xxxxxxxxxxxxxxxxxxxxxxxxxxxx, SE, selling drugs, meeting with associates to discuss drug business, dropping off drugs for sale, and collecting drug proceeds.  S-1 has also personally observed CHRISTOPHER LEE BECTON also known as  Rock,  and TYRONE WASHINGTON, also known as  T-Y, also known as  T-Rock, in the "pit," overseeing drug sales in that area, as well as selling narcotics "hand to hand" in several buildings located in the Second Court, within the xxxxxxxxxxxxxxxxxxxxxxxxxxxStreet, SE, Washington, D.C. S-1 knows that neither BECTON nor BEST "trust" CHRIS BECTON with "any weight."

21.     S-1  stated that MIAH JACKSON  is one of WILLIE BEST's many "girls." S-1 stated that on several occasions, beginning in 2003,  BEST told S-1 that he "stashed" drugs in JACKSON's house.

22.     S-1  stated that CAROLYN BECTON  has, on several occasions, asked her son, WILLIE BEST, for money, and he has given it to her.  S-1 knew at the time she was asking for the money, BEST did not have legitimate employment.

23.     S-1 has stated that ROBERT CHASE, and several others, were complaining as recently as May 2007 that JAMES BECTON, also known as  Pumpkin, also known as  P, also known as  Funk, was charging "top dollar" for  "bad quality crack," or "junk." CHASE told S-1 as recently as May 2007 that there was a shortage of crack on Fourth Street, SE, and "Pumpkin

[JAMES BECTON] was the only one who had anything to sell."

24.     S-1 knows that on two occasions, individuals unknown to S-1, recently approached JAMES BECTON in the "pit," and asked to purchase crack cocaine. BECTON directed both individuals to "go see LIPS" (JARON EVANS), to make the sales.

25.     S-1 has personally observed ANTHONY HYMAN, also known as Mook, and JAQUAN BEST, also known as Wop, also known as Quan, walking to and from 4203 Fourth Street, SE, located in the First Court, Atlantic Gardens Apartments. This apartment is presently occupied by ANTHONY BEST, also known as Ant, the older brother of WILLIE BEST, and is used by HYMAN, JAQUAN BEST, RUBIN BUTLER, and JAMES BECTON to stash guns, drugs and proceeds of this criminal organization. As recently as May 5, 2007, S-1 observed HYMAN selling drugs in the buildings.

26.     S-1 knows that several residents in the xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx, SE have complained to JARON EVANS' grandmother about his drug trafficking in and around the buildings at those locations. Based on a review of tenant records pursuant to an administrative subpoena served on Winn Management in Richmond, Virginia, your affiant knows that JARON EVANS ' grandmother lives at xxxxxxxxxxxxxxxxxxxxxx, Washington, D.C.

<u>Confidential Source Number Two</u>

27.     Confidential Source Number 2 (hereinafter referred to as "S-2") began providing information to the FBI concerning narcotics trafficking, firearms, and acts of violence in August of 2003. S-2 is presently incarcerated and has an extensive criminal history. S-2 is also working with the government pursuant to a cooperation agreement.

28.      S-2 has provided reliable information concerning criminal activity which has been

corroborated by the FBI and other sources of information during the investigation.  S-2 has also

provided reliable information concerning crimes other than narcotics offenses, including, but not

limited to, murders, shootings and other offenses, and S-2 has never been known to provide false

information.   According to S-2, it has known WILLIE BEST, JAMES BECTON and

FREDERICK MERCER for over five years and has personally witnessed them and their

associates sell crack cocaine on xxxxxxxxxxxxx, SE, D.C.  Moreover, S-2 has known BEST,

BECTON, MERCER, and their associates, to include RUSSELL RAMSEUR, to have worked

together to redistribute large quantities of cocaine, crack cocaine and/or marijuana in and around

the southeast quadrant of Washington, DC.  According to S-2, BEST's organization is

responsible for selling illegal drugs primarily in the xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx Street,

SE, D.C., and BEST, BECTON, MERCER, and their organization are violent and have ready

access to a variety of firearms.

29.      S-2 is aware of a number of violent acts BECTON has committed on behalf of

BEST. S-2 is also aware that BEST relies on BECTON for enforcement within their drug

trafficking organization and S-2 knows that MERCER is a distributor for this narcotics

enterprise.  Moreover, S-2 has witnessed BECTON deliver drugs to buyers on behalf of BEST,

pick up money owed to BEST, and sell drugs hand-to-hand for long periods of time, to include a

time period between 1998 and 2003.  Also, S-2  purchased drugs (crack) from JAMES BECTON

between 2000 and 2003, and on at least one occasion S-2 purchased drugs from BEST in 2003.

S-2 has also overheard BECTON instructing another co-conspirator named KEITH SAMPLER,

also known as "Son" and "Son-Son," to retaliate against rival drug dealers.

31

30.    S-2  knows that at times during the life of this conspiracy, BEST has supplied TYRONE WASHINGTON with up to 1/8 of a kilo of crack cocaine on a weekly basis. S-2 also knows that on at least one occasion, TYRONE WASHINGTON drove the getaway vehicle after the attempted robbery of a rival drug dealer went awry.

31.    S-2 knows that BEST was supplying 1/8  of a kilo of crack cocaine to CHRISTOPHER LEE BECTON on a weekly basis.  On at least one occasion, S-2 was with CHRISTOPHER LEE BECTON when BEST delivered the crack cocaine to him.  BEST told BECTON "make sure you get me my three when you get it."  Your affiant knows that "my three" is a reference to $3000,  which at the time, was the going rate for an eighth of a kilo of crack cocaine. On another occasion, CHRISTOPHER LEE BECTON told S-2 that "things were really going well on Halley Terrace," an area where CHRISTOPHER LEE BECTON was known to both frequent and sell drugs.

32.    S-2 is also aware that  JAQUAN BEST was being supplied by WILLIE BEST with a couple of ounces every week. In mid to late 2003, S-2 personally observed JAQUAN BEST selling drugs.

33.    On at least two occasions, S-2 observed WILLIE BEST give CAROLYN BECTON several thousand dollars.  BEST gave his mother the money inside DANIEL BECTON's apartment, located at xxxxxxxxxxxxxxxxxxx, SE, in the "pit."  DANIEL BECTON, also known as COUNTRY, is CAROLYN BECTON's brother, and the father of CHRISTOPHER LEE BECTON, also known as  Rock.

### Confidential Source Number Three

34.    Confidential Source Number Three (hereinafter referred as "S-3") began

providing information to the FBI in December of 2004.  S-3 is presently incarcerated and has an extensive criminal history.  S-3 is also working with the Government pursuant to a cooperation agreement and has not been paid for assistance it has provided.

35.    S-3  has assisted the FBI and other law enforcement agencies in several drug investigations, this information has been corroborated by other sources of information and evidence, and S-3 has never been known to provide false information.

36.    According to S-3, it has known WILLIE BEST and JAMES BECTON for over 10 years. BEST and BECTON have been supplying crack cocaine in the southeast quadrant of the District of Columbia for a long period of time, MERCER is a member of their criminal organization and works for BEST, and BEST controls the drug trade on Fourth Street, SE, D.C.

37.    S-3 states that BEST transported multiple kilogram quantities of cocaine from North Carolina in 2004 and S-3 also knows that in October 2004 BEST and others were arrested in North Carolina after four kilograms of cocaine were found by the police during a traffic stop. Moreover, in 2004,  S-3 overheard BEST discussing purchasing firearms and bringing them into the District of Columbia.

38.    S-3 states that MIAH JACKSON has, on several occasions, rented vehicles on behalf of, and for use by, WILLIE BEST, which BEST has used to transport multiple kilogram quantities of cocaine from North Carolina. S-3 knew JACKSON as "WHITE GIRL," and described her as one of BEST's "many girls."

39.    S-3 also stated on occasions, during the life of this conspiracy, S-3 has transported drugs and proceeds for WILLIE BEST to MICHAEL EUGENE FLEMING, also known as White Mike.

<u>        Confidential Source Number Four</u>

40.     Confidential Source Number Four (hereinafter referred to as "S-4") began cooperating with the FBI in March of 2005.  S-4 has an extensive criminal history and is presently incarcerated; however, there are no pending charges against S-4 and S-4 cooperating with the government in exchange for consideration of a potential reduced jail sentence in the future.

41.     S-4 has assisted the FBI and other law enforcement agencies in several criminal investigations and S-4 has not been paid for the assistance it has provided.  Intelligence or information provided by S-4 has been corroborated by other sources of information and evidence, and S-4 has never been known to provide false information.

42.     S-4 has known JAMES BECTON and WILLIE BEST since the late 1990s and during that same time period S-4 began purchasing eight-ball quantities (3.5 gams) of crack cocaine from BEST.  S-4 then increased to purchasing ounce quantities (28 grams) of crack cocaine from BEST in late 1990s.  BEST ultimately gave S-4 advice on how to increase S-4's profit margin in the drug trade and at one point S-4 purchased thirty-one gram quantities of crack cocaine from BEST twice a week in the late 1990s.  From January 2002 until July 2002, S-4 also purchased crack cocaine from BEST.

43.     According to S-4, BEST recruited S-4 to sell illegal drugs on Fourth Street, SE, D.C., and S-4 was making so much money from selling the drugs it got from BEST that it would meet BEST several times a week to "re-up" (get more drugs).  Furthermore, BEST told S-4 at one point that S-4 needed to consider drug trafficking as a career.

44.     S-4 also sold guns to BEST on a number of occasions and received crack cocaine

from BEST as payment for the firearms.   In July 2002 S-4 also obtained guns from BEST on Fourth Street, SE, D.C.

   B.    **CONTROLLED PURCHASES OF NARCOTICS**

   45.    In addition to intelligence derived from Confidential Informants, the affiant's investigation incorporated several undercover of clandestine purchases of illegal narcotics from the BEST-BECTON drug organization which demonstrated its involvement in drug trafficking. More specifically, undercover drug purchases were derived from Confidential Source Number Five (hereinafter referred to as "S-5"), Confidential Source Number Six (hereinafter referred to as "S-6"), and Confidential Source Number Seven (hereinafter referred to as "S-7"). S-5 began cooperating with the FBI in November of 1996. S-5 is presently incarcerated and has an extensive criminal history; however, there are no pending charges against S-5 and S-5 is working with the Government in exchange for consideration of a reduction in sentence.  S-5 has assisted the FBI and other law enforcement agencies in several criminal investigations and S-5 has never been know to provide false information.

   46.    On May 1, 2001, S-5 went to 4219 Fourth Street, SE, Apartment #7, and was told by a female, believed to be JAMES BECTON's girlfriend, that BECTON had just left but he would be returning shortly.  A short time later, BECTON returned and told S-5 to wait in the parking lot while he went into 4219 Fourth Street, SE. A short time later, BEST entered the parking lot and asked S-5 if S-5 was waiting for his brother.  S-5 replied yes, and BEST told S-5 to come with him.  S-5 and BEST then entered 4219 Fourth Street, SE and found BECTON in the hallway.  At that point, BECTON told S-5 that the cocaine he was selling was "butter," meaning high quality cocaine.  Thereafter, S-5 gave BECTON $1200.00 in pre-recorded funds in

35

exchange for eight small blue plastic zip lock bags in the presence of BEST. After the

transaction, S-5 gave the drugs to law enforcement officials. The bags and their contents, which

weighed approximately 30 grams, field -tested positive for cocaine and were confirmed as

cocaine through DEA Laboratory analysis. The conversation between S-5, BEST and BECTON

was recorded.

47.     On June 18, 2001, S-5 contacted BEST and asked to purchase one ounce of crack

cocaine. Thereafter, BEST told S-5 he would be delayed in getting to Fourth Street, SE, because

he (BEST) had to pick up his children first. A short time later, BEST drove into the parking lot

near 4217 Fourth Street, SE, Washington, D.C. He later gave S-5 a plastic bag containing a

single chunk of an off-white rock- like substance and S-5 gave him $1200.00. After the

transaction, S-5 gave the drugs to law enforcement officials. The contents and the bag, which

weighed approximately 28.3 grams, field-tested positive for cocaine and was later confirmed as

cocaine through DEA Laboratory analysis. The conversation between S-5 and BEST was

recorded.

48.     S-6 began cooperating with the FBI in April of 2002. Moreover, S-6 has an

extensive criminal history, is awaiting sentencing on drug charges, and is working with the

Government in exchange for potentially receiving a more lenient sentence. S-6 has assisted the

FBI and other law enforcement agencies in several criminal investigations and S-6 has never

been known to provide false information.

49.     On June 6, 2002, S-6 made a controlled purchase of crack cocaine from BEST.

While in route to meet BEST, S-6 received a call from BEST, who stated he was in the 4100

block of Fourth Street, SE. S-6 arrived at that location in the District of Columbia and BEST got

into S-6's car.  Soon thereafter, S-6 gave BEST $1500.00 of pre-recorded funds and BEST gave

S-6 a plastic sandwich bag with what appeared to be crack cocaine inside.  S-6 ultimately gave

the crack to the FBI.  The contents of the bag weighed approximately 29.1 grams, field-tested

positive for cocaine, and was later confirmed as cocaine through DEA Laboratory analysis.  The

conversation between S-6 and BEST was recorded.

50.     On June 19, 2002, S-6 drove into the parking lot of the pit, an area located on

Fourth Street, SE, D.C.  During that time period, S-6 observed BEST, BECTON and several of

their associates.  S-6 eventually approached BEST then BEST, S-6, and another individual S-6

did not know walked over to BEST's white Cadillac Escalade.  Thereafter, S-6 gave BEST

$1500.00 in pre-recorded funds then BEST and BECTON talked near BEST's vehicle.  Later,

BEST went into his car, returned with several blue zip lock bags, and put them in the front

pocket of S-6's jacket. S-6 then left the area and gave the bags to the FBI.  The contents of the

bags weighed approximately 27.1 grams, field-tested positive for the presence of cocaine, and

was later confirmed as cocaine by DEA Laboratory analysis.

51.     Confidential Source Number Seven  (hereinafter referred to as  "S-7") began

cooperating with the Metropolitan Police Department and subsequently the FBI in 2003.  S-7 has

an extensive criminal history and is presently incarcerated; however, there are no pending

charges against S-7.  S-7 is  cooperating with the government in exchange for consideration of a

potential reduced jail sentence in the future.  S-7 has assisted other law enforcement agencies in

several criminal investigations, and S-7 has never been known to provide false information.

52.     S-7 began dealing crack cocaine in approximately 1997 and started buying from

MICHAEL FLEMING in 1998.  S-7 has known FLEMING for more than ten years. S-7 first

purchased "62's" (62 grams) of crack cocaine from FLEMING and then increased to purchasing 125 grams.

53.    On September 24, 2002, S -7 purchased approximately 125 grams of crack cocaine from FLEMING, for $3300.00.  Approximately one month later, on October 22, 2002, S-7 again purchased approximately 125 grams of crack cocaine from FLEMING for $3300.00. Analysis conducted by the DEA Laboratory confirmed the presence of cocaine base for both purchases.

54.     S-7  stated that on several occasions,  S-7 discussed with WILLIE BEST the purchase price of  varying amounts of cocaine. S-7 also stated that on at least one occasion, in the summer of 2003, MICHAEL FLEMING was a passenger in a white Cadillac Escalade being driven by WILLIE BEST, and MICHAEL FLEMING was in the passenger seat.  S-7 estimated that this  happened in the summer of 2003.

### C.    <u>JUDICIALLY AUTHORIZED WIRETAPS</u>

55.    On September 27, 2005,  the Honorable Colleen Kollar-Kotelly, United States District Judge for the District of Columbia, issued an order authorizing the interception of wire communications to and from mobile cellular telephone number (XXX) XXXXXXXX, the telephone utilized by FREDERICK MERCER.  The FBI intercepted communications to and from this telephone between September 27, 2005, and October 26, 2005.  On October 27, 2005, the Court issued an order authorizing the interception of wire communications to and from mobile cellular telephone number (XXXXXXXXXXXXX the telephone utilized by JAMES BECTON, and the FBI intercepted communications to and from this telephone between October 27, 2005, and November 25, 2005.

56.     On December 16, 2005, the Court issued another order which authorized the FBI to intercept communications to and from mobile cellular telephone number (XXXXXXXXXXXXX, the telephone utilized by FREDERICK MERCER, and the FBI intercepted communications to and from this telephone from December 16, 2005, until January 15, 2006.  On January 27, 2006, the Court issued an order which authorized the FBI to intercept communications to and from mobile cellular telephone number (XXXXXXXXXXXXX the telephone utilized by WILLIE BEST, and the FBI intercepted communications to and from this telephone from January 27, 2006, until February 25, 2006.  On February 24, 2006, the Court issued an order which authorized the FBI to continue to intercept these communications, and this interception expired on March 27, 2006.

57.     On April 4, 2006,  the Court issued an order authorizing the interception of wire communications to and from telephone numbers (XXXXXXXXXXXXXXXXX ( XXXXXXXXXXXXXXXX, and (XXXXXXXXXXXXX, all numbers utilized by JAMES BECTON.  The FBI began intercepting communications from these telephones on or about April 4, 2006, and terminated interception of telephone numbers (XXXXXXXXXXXXX  and (XXXXXXXXXXXXX on June 6, 2006, and on telephone number (XXXXXXXXXXXXX on May 23, 2006.  Intercepted communications derived from these wiretaps and associated with JAMES BECTON JAMES BECTON, WILLIE BEST, FREDERICK MERCER, SHANNON BEST, and others also demonstrate the existence of a long-term and on-going conspiracy to distribute and possess with the intent to distribute illegal narcotics and commit related crimes. These conversations include, but are not limited to, the following:

58.     <u>Activation # 2605</u>

On October 7, 2005, at approximately 1:45 p.m., Frederick Mercer made an outgoing telephone call and talked with an unknown female at (XXXXXXXXXXXXX.  During their conversation, Mercer can be overheard having a background conversation with another male who asked Mercer what was up with them guns.  Mercer then responded that he had not been anywhere and the male told Mercer that he needed some clips or something and that he had a Mac-11.  During further conversation, the male said that he did not have a clip at that point and they discussed, among other things, the murder of Dre by some little ass who the male was tired of.  Then the male said he had some bad feelings about something that happened last night and that he had a joint but needed a clip for it.

Investigators believe that during this conversation Mercer and an unknown male discussed firearms and violence and the unknown male's need for a clip for his firearm to be used in a situation on the street that might require violence.

59.    Activation # 2658

On October 7, 2005, at approximately 4:24 p.m., Frederick Mercer received an incoming call from an unknown male at (XXXXXXXXXXXXX.  During their telephone conversation, Mercer asked the male if he found that joint and the male said that he got it.  Thereafter, Mercer told him that he wanted him to ask someone about the "new Redskin joint" I got and that nephew just hollered and bought a jersey, a whole jersey, a half a jersey from him.  Mercer then said that he was coming back through there in about twenty minutes after he made a move real quick.

Investigators believe that during this conversation Mercer told an unknown male that he had a supply of cocaine, referred to by code as a "new Redskin joint," and that someone he referred to as nephew just bought cocaine, possibly either a half kilogram or whole kilogram of

40

cocaine, from him.

60.    Activation # 2928

On October 8, 2005, at approximately 1:11 p.m., Frederick Mercer made an outgoing telephone call and ultimately talked with a female believed to be Shannon Best, also known as Big Face, at (XXXXXXXXXXXXXX  At the initial part of this call, Mercer talked with Best and he told her to call that motherfucker on the number she had for him.  Later during this call, Mercer stopped talking with Best and talked to a person believed to be James Becton. During their conversation, Mercer told Becton that he was getting calls bright and early and could not contact him.  He later asked Becton if he still had them "two tennis shoes" and Becton responded that they were already gone, them joints from Uma were already gone.  Ultimately, Becton said that he had been out since about six-thirty, and after Mercer asked him why he didn't call his phone, Becton said he thought Mercer was still asleep and that he had been around the area getting it in.  Afterwards, Mercer said that he went in about three o'clock and Becton said he had been getting it in.  Then Mercer said that his shift was about to stop motherfucker, and that was how they were going to do it, on this shift joint.  Finally, Becton said his operation was shut down and they agreed to meet later.

Investigators believe that during this conversation Mercer told Becton that he was receiving calls from customers all morning and ultimately asked Becton if he had drugs, which he referred to by code "two tennis shoes."  Thereafter, they discussed dealing drugs in shifts in a particular area, which primarily would be the XXXXXXXXXXXXXXXXXXXX block of Fourth Street, Southeast, D.C.

61.    Activation # 181

On October 28, 2005, at approximately 9:49 p.m., James Becton made an outgoing call to a female believed to be Shannon Best, also known as Big Face, at (XXXXXXXXXXXXX. During their conversation, Becton asked Best where she was at and she said "Wheeler Road." He then asked her "you got some of them joints with you?" and after she said "yeah," he asked "how many?" and she said "eight." Becton then asked her if she was trying to come up to Big D's and she said that she would come up there.

Investigators believe that during this call, Becton asked Best if she still had cocaine, most likely "eight" bags to sell, and she confirmed that she did. They then agreed to meet at the location called Big Ds, which is a Barbershop and Towing Shop located at 4700 St. Barnabas Road, Temple Hills, Maryland.

62.    Activation # 1165

On November 2, 2005, at 10:54 a.m., Becton received an incoming telephone call from a person believed to be Shannon Best, also known as Big Face, at (XXXXXXXXXXXXX. During the conversation, Best tells Becton that "those things" are still in the ashtray. Later when he asks her what she is talking about, she repeats "them things" and Becton then responds "Oh."

Investigators believe that during this call Best advised Becton of the location of some drugs and, in a sense, that drugs that were in the vehicle and needed to be removed or concealed.

63.    Activation # 33

On November 7, 2005, at approximately 5:22 p.m., James Becton made an outgoing call to a male believed to be Willie Best at (XXXXXXXXXXXXX. During the call, Becton told Best that he was about to take his urine then he was going to slide around the way. Best then said that he was about to be at Ma's house and that he was a little on "the light side" though, and

Becton responded that he would just grab that and that he would just tell them, and that he would

owe them later.  They then discussed Best seeing a person he described as a "red ho."

Investigators believe that during this call Best, by saying he was on the "light side," told

Becton he didn't have all the money to pay for the drugs in a drug deal and Becton advised him

that he would take the money he had, pay for the drugs with that, and tell the supplier that he

would pay him the rest of the money for the drugs later.  Moreover, Carolyn Becton is Best and

Becton's mother and she resides at XXXXXXXXXXXXXXXX, SE, Washington, D.C.

64.    Activation # 11092

On December 31, 2005, at approximately 5:45 p.m., Frederick Mercer received an

incoming telephone call from an unknown male at (XXXXXXXXXXXX.  During the call, he

told Mercer that he was looking for him then he said "we ate breakfast this morning man, and I

got man only two eggs left."  Mercer then said "oh, for real?" and said "that's ugly right there."

Thereafter, the male told Mercer that he thought he went grocery shopping and Mercer said that

he was supposed to have gone but he did not go.  He also said that the way he went he had

transportation and that he had somebody else driving.  Next, Mercer asked the male was he near

Big Face's joint and the male said yes and that he was by his house.  Mercer then told the male

that he could not catch Funk, that he just talked to Big Face, and that she just dropped him off in

the house, over that joint.  He also instructed the male that his best bet was to breeze through

there and holler at him right then and right there for him to give you what you need cause it was

hard to catch up with him when his phone was on his charger.  Mercer also said that Big Face

was out making runs for the night, that Funk was at the house, that the male should call him

back.  The male then said that he would call him when he was right there.

43

Investigators believe that during this call a male told Mercer that he sold drugs the previous night and that he only had a "two" quantity of drugs left.  Mercer then said he did not get any drugs and he ultimately told the male that Shannon Best, who is known as "Big Face" was out selling drugs that night and that he needed to meet someone nicknamed "Funk" and get drugs from him.  This call relates to activation # 11101, which occurred on December 31, 2005, at 6:03 p.m.  During this follow-up call, this same male told Mercer that he was at the residence and knocking on the door and no one was there.  Mercer then said that he would call "Big Face" (Shannon Best) for him.

65.    Activation # 184

On January 27, 2006, at approximately 6:45 p.m., Willie Best made an outgoing call to a male believed to be Frederick Mercer at (XXXXXXXXXXXXX.  During their conversation, Best asked him if he already told Tyra to drop him off and Mercer said no and that she just got off work.  Mercer then said that he had a "J," commented "you know I'm trying to," and then told Best to bring him that "duck" too.  Best then asked him if he did what he asked him to do, Mercer said yes, and Best responded that he would have "that."  Mercer then asked how long he was going to be before he came and Best told him fifteen minutes.

Investigators believe that during this call Mercer told Best that he had marijuana, described as a "J," and that he was trying to get high.  He also instructed Best to bring him some drugs or a weapon, which are described in code as a "duck."  Best agreed to do as requested.

66.    Activation # 796

On January 29, 2006, at approximately 2:50 p.m., Willie Best received an incoming call from an unknown  male at (XXXXXXXXXXXXX.  During their conversation, he told Best that

44

"Man" was not on this joint, that he was not answering his joint, and that he was probably "with his Boo-Boo today." Best then asked him could he catch up with him and he said that he could not and indicated that they were trying to "publish" and trying to "have some space." Best then commented that the male had been making "some good ass moves," which he also described as "some decent ass moves like a motherfucker" and "some power moves." He then told the male that he had been doing "better than your boy lately" and commented that he told "that boy" not to buy all of that, but the person would not listen to him, and that he did "not fuck with all that shit" because you need to see how it worked. Later, he said this person was going "for everything" and even for that "assassin's shit" to see how it worked out. Best then said he tried to explain to him, it ain't nothing against nobody but you "see how you like all that shit" cause what you like, the next person, you know what I'm saying, might not. He then said that he was "mad as a motherfucker" and that he "just dropped all that ole shit" he just "concocted." Best then said he had to get off the telephone, which he described as this "joint."

Investigators believe that during this call Best advised a co-conspirator that he was impressed with the amount of drugs he had sold recently, an amount of drug trafficking Best indicated surpassed even his own sales. Best also told the male that what one person likes as drugs another person might not like and that he was upset because he had to discard some crack he "concocted" or cooked because its poor quality. Finally, Best also cautioned the male against acting like another dealer who bought all types of drugs without even knowing its quality.

67.    Activation # 800

On January 29, 2006, at approximately 3:03 p.m., Willie Best received an incoming call from a male believed to be Frederick Mercer at (XXXXXXXXXXXXX. During their

45

conversation, Best said that he was waiting for "that bitch to come through" and holler at him now and Mercer said that he was going to fuck somebody up because he had a dream last night about his aunt Carolyn.  At that point, Best asked him where he was at and he said that he was "around the way."  Best then informed Mercer that he wanted him to come meet him and Mercer responded that he did not have any wheels, that his car needed an alternator, and that he had to take care of it this month.  Thereafter, Best also said that he did not have a ride and that he was in "this joint trying to bake some fish and shit" then Mercer commented that he had "a broad" that brought him "some shit" last Christmas.  The call then terminated.

Investigators believe that during this call when Best told Mercer that he was at "this joint trying to bake some fish and shit," he informed Mercer that he was trying to cook powder cocaine into crack cocaine.  The call then terminated after Mercer mentioned that he had drugs, which he described in code as "some shit," that a female brought him in December.

68.    Activation # 1961

On February 3, 2006, at approximately 12:12 a.m., Willie Best made an outgoing call to a male believed to be Frederick Mercer at (XXXXXXXXXXXXX.  During the call, Best asked Mercer if he was around and Mercer replied "yeah, I'm around" and indicated that "it's hot as a motherfucker up here."  Best then asked him about that "joint" and he responded that he did not know what was going on over in that joint.  At that point, Best asked him where "Black" was at and Mercer said that he did not know and that he tried to call him but did not get through.  Best then said that Black told him he was on his way over here but then he saw "all them peoples up there like they, you know what I mean."  He then told Mercer to call someone over there and see what was going on.

Investigators believe that during this call Mercer advised Best of police presence in "the pit," that is, the area (the XXXXXXXXXXXXXXXXXX block of Fourth Street, Southeast) they frequently sold drugs. Best also inquired about the location of a co-conspirator nicknamed "Black."

69.    Activation # 26

On April 4, 2006, at approximately 3:21 p.m., James Becton made an outgoing call to an unknown male at (XXXXXXXXXXXXXX. During the call, he told Becton that he was coming out of an elementary school then Becton told him to come "in the first court." He then advised Becton that he would call him when he got there.

Investigators believe that this call is significant because Becton instructed someone to meet him in the "first court," a location in the XXXXXXXXXXXXXXXXXXXX Street, Southeast, where Becton and co-conspirators primarily sell narcotics.

70.    Activation # 135

On April 4, 2006, at approximately 6:06 p.m., James Becton made an outgoing call to an unknown male at (XXXXXXXXXXXXXX During this call, they discussed fixing a Cadillac. Later, another unknown male called Becton and asked him if he was in "the area" and Becton said that he just came home. At that point, he asked Becton if he had "that joint" with him and Becton responded that he did not and that he left it right in there. He then asked Becton if "Son" was up there and Becton replied that he did not know and that he might be in the "joint." Thereafter, he instructed Becton to check for him so he ["Son"] would stop calling him then Becton asked him if he had any "news." He then responded that "the dude" called him but wanted "twenty-two dollars," and Becton asked him if what [the price] he "hit" him for that "last

one" was "twenty-four."  At that point, he asked Becton "which one" he was talking about and Becton informed him that he was talking about "the last time I got from you."  He then said no, asked Becton if he meant the one for which he just gave him that "money" back, and Becton advised him yes.  Afterwards, he told Becton that the price was "six for the q," Becton commented to him that "six for a q" was "twenty-four," and he advised Becton that he was right and that if you purchased all "four" of them it [the price] would have been twenty-four.

During this conversation, he also told Becton that he [the source] was down to "twenty-two" now, that he was not "fucking" with that, and that he told him that if he went with the "two-one" he might go with it.  He also informed Becton that he was tired of people continuing to crack him, that he did not even grab one, and that the guy called and left him four messages.  He then said that he was looking for a "one" and said that until he found that, he would probably "chill."  Becton also said that he intended to "chill" and said that he was "waiting now."  Later, this same male informed Becton that he wanted him to let him know when he heard something. He also told him that if he got "desperate" he might call but right now he did not intend to do anything, and that he had some "vitamins" he was trying to get rid of and he wished he had not purchased them.  He then asked Becton if he already got rid of all of his, Becton said yes, and he advised Becton that he was trying to sell "twenty-seven" packs of them.

Investigators believe that during Becton's second conversation they discussed the price of cocaine they wanted a source to reduce the price of cocaine to before they purchased it from him. More specifically, they discussed the price of a quarter (a "q" or 250 grams) of a kilogram (1000 grams) of cocaine for $6,000 ("six"), the dealer's price of selling a kilogram for $22,000 ("twenty-two dollars), and the fact that the person Becton was talking to wanted to wait until the

48

price of the kilogram dropped to $21,000. They also mentioned during their conversation that this male previously sold Becton a kilogram for $24,000, and the male indicated that the price was lower now. The person identified during their conversation as "Son" is Keith Sampler, also known as "Son-Son," and their reference to both having "vitamins" for sale means they both sell ecstasy pills or some other drug in addition to cocaine.

71.     Activation # 545

On April 6, 2006, at approximately 2:55 p.m., James Becton made an outgoing call to an unknown male at (XXXXXXXXXXXXXX  During this call, Becton asked him where he was at and he responded that he was in Laurel with his "folks."  Becton then told him that he was going to bring "that joint" by so they could "see it" then he responded that he was not in the house but his "cousin" was there.  Next, he asked Becton if he had a "little something" and Becton replied that he had "a whole one" then asked the male if he wanted him to take it by and let his cousin see it.  He then replied that he did and said that he would call his cousin so he would come outside when Becton got there.

Investigators believe that during this call Becton talked with a customer and advised him that he had "a whole one," that is, one kilogram (1000 grams) of cocaine for sale.  He then told his customer that he would take it to his cousin and let him look at it so he could decide if he wanted to purchase it.

72.     Activation # 650

On April 6, 2006, at approximately 7:26 p.m., James Becton received an incoming call from an unknown male believed to be Russell Ramseur, also known as "Squirt," at (XXXXXXXXXXXXX.  During this call, he told Becton that they were "looking good," that he

just went ahead and grabbed the little "Q-Street" from his man, and that he could not stand that "twenty-two dollars" right now even though she was "great" and "looked good." Ramseur then told Becton that if he knew anybody looking he should just call him and let him know then Becton said that he needed "some help." He then told Becton again that "twenty-two dollars" had him looking out, that he told a certain person he would get a "Q," and that he would probably catch this person on the next go around because he had to build his "shit" up first. He then instructed Becton to let him know whatever he decided to do and Becton confirmed that he would do so.

Investigators believe that during this conversation Ramseur advised Becton that a source had good quality cocaine to sell, that this source was selling a kilogram of cocaine for $22,000.00 (price coded as "twenty-two dollars"), and that he only purchased a quarter of a kilogram (250 grams or a quarter of a kilogram coded as "Q-Street") of cocaine for him because the price of an entire kilogram was too much for him to pay. Becton also told him that he needed extra money from someone to purchase a kilogram of cocaine and he ultimately agreed to contact Ramseur if he wanted to purchase drugs from the source.

73.    Activation # 757

On April 7, 2006, at approximately 3:57 a.m., James Becton received an incoming call from an unknown male at (XXXXXXXXXXXXX. During this call, he asked Becton if he was around and after Becton said that he was, he told Becton that he needed him and that he had a "slight little situation," which he also referred to as "a little problem." He then asked Becton if he had "bitch" around with him and Becton told him that he could "hold mine." He then told Becton that he was on his way to meet him "right now."

50

Investigators believe that during this call someone advised Becton that he had a problem on the street and needed a gun, which he referred to in code as a "bitch." Becton ultimately told this person that he could use his firearm if he needed to and the male told Becton he was coming to get it from him at that time.

74.     Activation # 775

On April 7, 2006, at approximately 9:39 a.m., James Becton made an outgoing call to an unknown male at (XXXXXXXXXXXXX. During this call, someone told the male talking with Becton on the telephone to ask Becton where the "burners" were at. Becton then asked him who said that and he responded "Son." At that point, Becton said that he thought "Da-Da" had them then he responded that they went somewhere last night, that "Da-Da" and "Quan" got both of "them joints," and that they did not show back up last night. Becton then said that he was about to call "Quan" now and the male advised Becton that he too wanted Becton to call "Quan" and see where they were at.

Investigators believe that during this call Becton and this person discussed "Da-Da" and "Quan" taking two firearms from them the previous night and not bringing them back. The person identified as "Son" is co-conspirator Keith Sampler, who is also known as "Son-Son" and "Da-Da" is James Becton's younger brother, Khadar Becton. The firearms are referred to in code by the terms "burners" and "them joints."

75.     Activation # 906

On April 7, 2006, at approximately 6:15 p.m., James Becton received an incoming call from an unknown male believed to be Shawn Best at (XXXXXXXXXXXXX. During this call, Becton told him to tell "Peaches" that he needed his "medicine" and Best asked him was his

51

"shit" fucking up.  At that point, Becton responded, "fuck yeah," and Best asked him if he got

him "another car." Afterwards, Becton advised him that he did not, commented that he had "sixty

thousand dollars worth of cars," and said that he was not buying another car unless it was "a

steal."  Becton also said that he had two Caravans, two Chrysler Concords, two Ford Tauruses, a

BMW, an Eldorado, and an Acura CL.  Best then asked him what year his cars were and how

much mileage they had on them and Best advised him that all his cars were "99s and up" and

said that the highest mileage one car had was a hundred thousand and the lowest mileage one had

was fifty-four thousand.  He also said that his BMW had sixty-two thousand miles.

76.    Investigators believe that this conversation is significant because Becton identified

nine vehicles that he acquired with assets derived from drug trafficking and in violation of the

federal money laundering and drug trafficking statutes.  As such, these vehicles are subject to

asset forfeiture.

77.    Activation # 1026

On April 8, 2006, at approximately 10:43 a.m., James Becton made an outgoing call to an

unknown male at (XXXXXXXXXXXX.  During this call, he told Becton that he was waiting

for him in the "building with Buster."  Becton then instructed him to ask Buster if he had his

"money" and he replied that he [Buster] was out here by himself so he should have it.  At that

point, Becton told this male to tell Buster that someone told him yesterday that he left with that

female with a "stack" and came back with a "short stack."  At that point, another male [Buster]

got on the telephone and said "What's up with you?" and Becton replied "my mother-fucking

money, you got it?"  He then said that he had "a hundred and something" on him and that he still

had "one-eighty worth of shit."  Becton then told him that they told him he "cranked out

52

yesterday" before he left with that female then he responded by telling Becton that he did not do what he claimed, that he had "way more than two hundred left," and that he did not come out because the "boys" were out there. Thereafter, Becton told him that he believed he was lying because he [Becton] was out there himself then he advised Becton that he and "White-Boy" stayed in the "joint" all last night and that they were in the "parking" lot. At that point, Becton asked him where was "Da-Da" and he informed him that he was at the apartment with "Son, White-Boy, and Ashton" and that they were asleep. Becton then told him he was about to come around there.

Investigators believe that during this call Becton talked with two males who sold drugs for him in the XXXXXXXXXXXXXXXXXX block of 4th Street, Southeast. Becton was concerned that Buster had "cranked out" or sold all the drugs and then took the money and spent some of it on a female before coming back with a smaller amount of cash. Ultimately, Buster told Becton that he did not do that, that he had more than a hundred dollars from selling drugs, and that he still had one hundred and eight dollars worth of drugs in his possession to sell. He also told Becton that he stayed in the building and parking lot selling drugs with "White-Boy" and did not come outside because of the police, who he described as the "boys." "Da-Da" has been identified as James Becton's younger brother, Khadar Becton. "Son" is Keith Sampler and "White-Boy" is Larnell Carr.

78.    Activation # 1194

On April 8, 2006, at approximately 7:08 p.m., James Becton made an outgoing call to an unknown male believed to be "Buster" at (XXXXXXXXXXXXX. During this call, Becton asked him where he was at and he responded that he was in "the building." He then asked him

what was his "status" and he replied "one-thirty."  Becton then told him that he had that same

thing last night and he said that he did not.  Becton then asked him if he was trying to have him

believe he had only "seen two people" and he responded that a rack of people were taking turns.

Thereafter, they discussed whether Buster was the only male in there and Becton, at one point,

asked him if he had been treating females with the money.  Later, Becton told him that he was

coming to meet him and advised Buster that he needed to give a key back to "Son."

Investigators believe that during this conversation Becton talked with one of his street-

level distributors who sold drugs from him in one of the apartment buildings in "the court," the

XXXX block of XXXXXXXXXXXXX, Southeast.  Here, Becton is concerned that Buster is not

selling enough drugs and that he is spending the money on women and, as such, he only earned

$130.00 from drug sales that day.   Buster ultimately explains to Becton that other people were

selling drugs too and that is why he only had that amount of money.  The person identified as

"Son" is co-conspirator Keith Sampler.

    79.   <u>Activation # 4010</u>

On April 18, 2006, at approximately 6:42 p.m., James Becton received an incoming call

from an unknown male at (XXXXXXXXXXXX.  During this call, he told Becton to come to

his house and see him.  He also told Becton that he needed "four" bad, that he wanted them on

the "smooth tip," and that he wanted them just "like the last joint" but  "just regular."  He also

advised Becton that they were "turning their nose up" at the "last little bit" then he asked Becton

what he wanted for that.  Becton then responded that he was going to call someone because he

was "all out" right now  then he said that he thought they had it, but it was "soft."  He then

informed Becton that he wanted it being "soft" and "not even touched" was just the way he

wanted it. At that point, Becton asked him if he was sure he only wanted "four" of them and he responded yes, and said that afterwards he intended to come right back and "do something else." He then said that he had a "125" and a "Reggie Miller joint" and that once it was done he would have a little bit off of that. At that point, Becton advised him that he had to call someone else because what he had was the last of the "little joint" he had and, at that point, he told Becton that he had "seven-fifty" for him though. Becton then told him that if he went and got "the same from them" he would go get the "what its name" or bring him with him or something like that and he responded that they were going to need to "see it first" since that last "shit happened" when they "whipped it up." He also said that "the first half of it was right," but when they got down to "the end" they said it was not the same. Thereafter, Becton and he agreed to meet once Becton came from around Iverson Mall.

Investigators believe that during this call Becton and this person discussed a future drug transaction. During their conversation, the unknown male advised Becton that he wanted powdered cocaine ("soft" or "not even touched") as opposed to crack cocaine (cocaine base or "hard" or "cooked cocaine). He also told Becton that he already had "125" grams of cocaine and "31" grams of cocaine, which he described in code as a "Reggie Miller," a former and famous basketball player for the Indiana Pacers who wore jersey number "31." Becton and he also discussed the fact that some customers did not like the last quantity of some cocaine and they were refusing to purchase it on the street.

80.    Activation # 4070

On April 18, 2006, at approximately 10:38 p.m., James Becton received an incoming call from an unknown male at (XXXXXXXXXXXXX. During this call, he asked Becton what was

the number for "this joint right here" and Becton replied that it was "twenty-three five." He then asked Becton if he meant for the "whole thing" and then asked him if he meant just for "this joint right here" "seven." Becton then told him for that joint right there he would be looking probably like "eight." He then said "all right."

Investigators believe that during the initial part of this call, which relates to activation # 4010, Becton and this same male discussed the price of a whole kilogram of cocaine being $23,500.00. Later, Becton and he discussed cocaine, which Becton referred to in code as "joint," and they discussed prices of "seven" (possibly $7,000.00) and "eight" (possibly $8,000.00).

81.    Activation # 4567

On April 20, 2006, at approximately 6:02 p.m., James Becton received an incoming call from a male believed to be Willie Best at (XXXXXXXXXXXXX. During this call, he told Becton that his daughter still had "a cold" and then asked Becton if he still had some "Vics-44, that cough shit." At that point, Becton responded that he did not and told Best that he just "gave the joint away." Best then said that "little dude" just called him and said that his daughter was sick and Becton advised him Best that someone else just beat him to the punch.

Investigators believe that during this conversation Willie Best, talking in a coded language, asked his brother if he still had drugs, which were described as "Vics-44" and "that cough shit." Best wanted the drugs for a customer who just called and requested to purchase it and Becton advised him that he already sold the drugs to someone else.

82.    Activation # 4571

On April 20, 2006, at approximately 6:09 p.m., James Becton received an incoming call from an unknown male at (XXXXXXXXXXXXX. During this call, he told Becton that certain

people contacted him and were trying to get the "Reggie Miller times two." He then asked Becton what "the numbers" were on that joint, the soft . . ." then Becton replied "thirteen-five" and then told him to give him a minute so he could do "the math" on it. Becton then said that if it was the same dude from the other day that "joint" would be like "fifteen" and he responded that he wanted "sixteen" and he said "eight a piece." Becton then replied "eight and eight" and he then responded that was what he was talking about. At that point, Becton said that he knew he would go "fifteen" and after he asked Becton if he was saying "fifteen-ten," Becton told him that it would be that unless he wanted it to be "sixteen." Thereafter, he told Becton that he did not, that someone had someone else "squashing" him off "fourteen and a half" and then the person went south with the numbers, and that he intended to contact this person and see if the liked "that number," and if he did, he intended to contact Becton so he could "do the do."

Investigators believe that during this call an unknown male contacted Becton and asked him if he could facilitate a drug transaction with another customer for two 31 gram quantities of powder cocaine. Reggie Miller was a famous basketball player with the Indiana Pacers who wore jersey number "31" and during this conversation the two thirty-one gram quantities of cocaine being requested from Becton are described in code as "Reggie Miller times two." The requested drug is powder cocaine, as opposed to crack or hard cocaine, as identified by the term "soft." Becton ultimately advised the caller that the price would be $1,500.00 for sixty-two grams (two 31s) of powder cocaine and the caller informed Becton that if the customer agreed to that price he would call Becton again so he could complete the deal.

83.    Activation # 4586

On April 20, 2006, at approximately 7:45 p.m., James Becton received an incoming call

from an unknown male at (XXXXXXXXXXXXX.  During this call, he told Becton that he was trying to get from him the "joint" like he "regularly" gets when he sees him, but this time it was for his "peoples."  He also told Becton that he wanted what he "regularly" does, "both of them," and that it was for his "peoples."  At that point, Becton asked him was he ready now and he responded by saying that she  was coming to see him now and that they would be in route and then asked Becton if all he had to do was see "Shorty."  Becton then responded "yeah, yeah" and he told Becton that he intended to call him when he was ready for him to "trip" him and that he wanted Becton to go ahead and tell him to get it ready for him.  Becton replied "all right."

Investigators believe that during this call a customer contacted Becton and informed him that he needed to get the same type of drugs that he "regularly" or usually got from him and that he wanted two or both of them for a female that was coming with him.  Becton ultimately agreed to have "Shorty," one of Becton's street-level distributors, prepare the drugs for delivery and then give it to the customer once he contacted Becton and advised him he was present with the female he was making the purchase for.

84.    Activation # 4802

On April 22, 2006, at approximately 5:36 p.m., James Becton received an incoming call from an unknown male at (XXXXXXXXXXXXX.  During this call, Becton asked him what was up with him and he responded "them girl things" and "ten of the girl things."  Becton then told him to stop it and once he told Becton that he was telling him and that he should call "Shannon," Becton advised him that Shannon might have "them joints" and that he could call his other "little man" and he had "them joints."  He then told Becton to call Shannon because she was not answering her telephone and he agreed to do so.

58

Investigators believe that during this conversation one of Becton's street-level drug distributors advised him that he needed a "ten" quantity of drugs, which he described in code as "them girl things." Becton ultimately advised him that "Shannon," a person identified by agents as co-conspirator Shannon Best, and one of his other street-level distributors had that quantity of drugs in their possession at that time.

85.    Activation # 4938

On April 23, 2006, at approximately 8:17 p.m., James Becton received an incoming call from an unknown male at (XXXXXXXXXXXX. During this call, Becton told him that he had them "what's a name" for him then he asked Becton where he was at. At that point, Becton responded that he was in "the house" and after he asked Becton was he coming out, Becton told him yes and asked him where he was going to be at. He then informed Becton that he was coming from down Seventh Street and he then agreed to contact Becton when he got on his side of town.

Investigators believe that during this call Becton informed a customer that he had drugs for him, and he described the drugs in code as "what's a name." This call is also significant because Becton said that he was at home, a residence agents have identified as 1930 Addison Road, South, District Heights, Maryland, and during this conversation he agreed to come from his home and deliver drugs to a customer. As such, Becton keeps a supply of illegal drugs or contraband at his residence for future delivery to customers.

86.    Agents had planned to execute a series of search warrants on May 2 or 3, 2006 in the XXXX and XXXX blocks of XXXXXX Street, SE, in Washington, D.C. In preparation for those warrants, on May 1, 2006, a police officer obtained access keys to the target locations from

59

the property management.  This officer had obtained keys and access cards on previous

occasions. Your affiant believes that after providing both keys to the lockout doors of the target

buildings as well as the target apartments, an employee who works in the property management

office, now known to be MIAH JACKSON, also known as White Girl, also known as Red Girl,

contacted WILLIE BEST and advised him of the police interest.  Based on intercepted

conversations, JACKSON contacted CAROLYN BECTON, as well and informed her of the

police interest.  Agents did not execute the warrants as originally planned.  Although members of

this narcotics conspiracy temporarily slowed their activities in the target area, recent reports from

MPD officers indicated that the narcotics activity soon returned to normal.

Activation #1180

87.     On May 2, 2006, at 3:28 p.m., JAMES BECTON made an outgoing call via

Direct Connect XXXXXXXXXXXX to an unknown male.  During this conversation, the

unknown male told BECTON he had something for him if he came through.  BECTON asked if

the "peoples,"  were still there, and if they had gone up in anyone's houses today?  The unknown

male told him "everything was proper," and he was about to go low for a minute.  BECTON says

he is going to call him when he comes on through. Investigators believe "the peoples" is a

reference to police, and that BECTON was asking if the police searched any places on Fourth

Street, SE.

## IV.     LOCATIONS TO BE SEARCHED

### A.     XXXXXXXXXXXXXXXXX, S.E., Washington, D.C. (Home of Carolyn Becton)

(1).     Description of the Premises

88.     The premises located at XXXXXXXXXXXXXXXXX, SE, Washington, D.C., are described as a single family, three story town house, with light grey vinyl siding with white trim and burgundy shutters. The structure has concrete steps with black metal rails leading to the entrance of the townhouse.  The structure has a covered porch supported by two white columns. The number "XXXXX is located on the front of the building in black letters, and is visible from XXXXXXXXXXXX, SE. A concrete sidewalk runs in front of the townhouse, and the front door is white metal.

(2).    Connection of Carolyn Becton and other Conspirators to
XXXXXXXXXXXXX                              Address

89.     Carolyn Becton, the mother of James Becton and Willie Latrell Best, resides at XXXXXXXXXXXXXXXXXX S.E.  This information has been provided by S-1 as well as another reliable source, and has been confirmed by Investigators.  As noted above, several of the telephones lines that were intercepted were subscribed to by CAROLYN BECTON and the address she gave to the cellular telephone companies was this address.  The telephone utilized by WILLIE BEST (XXXXXXXXXXXXX) as well as SHANNON BEST (XXXXXXXXXXXXXX are both in the name of CAROLYN BECTON and utilize the XXXXXXXXXXXXXXXXX, SE, address.  Beginning in December of 2006, law enforcement personnel have observed a vehicle with District of Columbia registration CR-0144 parked in front of XXXXXXXXXXXXXXXXX, SE as well as 1922 Savannah Terrace, SE.  A review of the automated records of the District of Columbia Division of Motor Vehicles revealed this vehicle to be registered to CAROLYN BECTON-MOODY at XXXXXXXXXXXXXXXXX, SE, Washington, DC.

90.     Information provided by S-1 as well another reliable source indicated that for a time, and as recently as March/April of 2007, JAMES BECTON was residing at the XXXX XXXXXX Place, SE address.  Surveillance by investigators places JAMES BECTON's Silver BMW 745i, parked on the street in front of XXXX XXXXXXXXXXXX on March 13, 2007 at 7:45 a.m. and March 16, 2007 at 8:00 a.m.  Your affiant knows the vehicle to be that of JAMES BECTON because he observed BECTON in that car when the vehicle had temporary Maryland tags.  The vehicle has recently been observed with Maryland Tags XXX-XXX. Investigation has revealed the vehicle to be dual registered with one of the registrants being JAMES BECTON.

91.     A confidential source, who has been providing reliable and truthful information to investigators since August of 2004,  advised on May 11, 2007, that James Becton maintains a room, which is padlocked,  at XXXX XXXXXXXXXXXXXX SE.  This room, located on an upper level of the town home, is the room of Becton's younger brother, who is deceased.  This source also observed RUBIN BUTLER living at XXXXXXXXXXXXPlace, SE, for several weeks up until early May of 2007. On May 17, 2007, this source reported that another member of the narcotics conspiracy, FREDERICK MERCER, was currently staying at XXXXXXXXXXX Place, SE.

92.     Throughout the life of this conspiracy, XXXX XXXXXXXXXXXXXXXX, has been used as a haven for members of this criminal organization.  Based on information previously provided to the Government,  S-1, S-2 and S-3 and S-6 have identified XXXXXXXXXXXXXXXXX, SE as the location of meetings with BECTON, BEST and other crew members; a location for drug transactions, and a location for crew members to  run to elude the police.  CAROLYN BECTON also provides other support to her sons and other members of

this criminal organization. BECTON also benefits from the proceeds of this organization.  An

example of this is detailed below:

93.    Activation # 175

On September 28, 2005, at 4:57 p.m., FREDERICK MERCER made an outgoing call to

CAROLYN BECTON at (XXXXXXXXXXXX.  During this conversation, BECTON tells

MERCER she needs money to pay her bills this month, as her house in the country is $1266 a

month before she even gets her check.  BECTON told MERCER she got what she needed, that

JAMES BECTON gave her five, RUSSELL RAMSEUR gave her five and she got another two

from another individual.  BECTON told MERCER to get a money order, since she needed the

money right there. MERCER told BECTON that she was living outside her means.  At the time

of this intercepted conversation, your affiant knows that JAMES BECTON, RUSSELL

RAMSEUR, and FREDERICK MERCER had no legitimate means of income and were engaged

in this narcotics conspiracy.

94.    Activation # 6259

On May 1, 2006, at approximately 1:01 p.m.,  JAMES BECTON made an outgoing call

to his mother, CAROLYN BECTON, who advised him he needed to "do something quick,

because they were coming  up in there first thing tomorrow morning."  CAROLYN BECTON

told BECTON she had gotten a call from MIAH JACKSON,  who told her the police planned

several early morning search warrants the next day.

(3).    Probable Cause as to Carolyn Becton and Wahler Place

95.    CAROLYN BECTON is employed by the District of Columbia Housing

Authority, and over the years, continues to facilitate her children's criminal activities by routinely

obtaining cellular phones for them, registering vehicles and other property for them in her name, as well as producing false and fraudulent payroll information for them and her nephew FREDERICK MERCER, to attempt to "legitimize" their activities for use in court proceedings or to obtain new residences. During each of the periods of interception, your affiant and other law enforcement personnel learned that CAROLYN BECTON was the subscriber of a number of cellular phones used by BEST, SHANNON BEST and other members of her family. Additionally, her address, XXXXXXXXXXXXXXXXX, SE, is the address used by JAMES BECTON, WILLIE BEST, and SHAWN BEST, who have provided it to law enforcement and court personnel as their home of record. As noted above, investigators received authorization to intercept the communications of James Becton on October 27, 2005 when he was using telephone (757) 582-5726. This telephone is subscribed to by CAROLYN BECTON at XXXXXXXXXXXXXXXXX, SE, Washington, D.C. That 30 day period of authorization, which expired on November 25, 2005, yielded the following evidence that CAROLYN BECTON maintains records for JAMES BECTON at the 1117 Wahler Place address:

a.     On October 31, 2005, an outgoing call was intercepted from JAMES BECTON's phone to telephone number (XXXXXXXXXXXXXX, CAROLYN BECTON's telephone, (Activation # 863). During this conversation, JAMES BECTON told his mother that he had two upcoming court dates. CAROLYN BECTON told BECTON that she had to look the dates back up and would call him back. Investigators believe that this call demonstrates CAROLYN BECTON keeps paperwork and records related to BECTON at her residence.

b.     On November 17, 2005, an outgoing call was intercepted from BECTON's telephone to (XXXXXXXXXXXXXX CAROLYN BECTON's telephone

(Activation #1216). During this conversation, CAROLYN BECTON reminded BECTON that he had another court date coming up.  CAROLYN BECTON told her son "they are going to lock your ass up," and she told BECTON she would call him the day before each of the court dates to remind him to appear.  Investigators believe this conversation confirms the existence of paperwork related to the activities of BECTON at CAROLYN BECTON'S home.

96.    As noted above, investigators received authorization to intercept the communications of WILLIE BEST on January 27, 2005 when he was using telephone (XXXXXXXXXXXXX.  This telephone was subscribed to by CAROLYN BECTON at XXXXXXXXXXXXXXace, SE, Washington, D.C.  That authorization period was extending for an additional 30 days that expired on March 27, 2006.

97.    On January 29, 2006, an outgoing call was intercepted from BEST's telephone to (XXXXXXXXXXXXX, CAROLYN BECTON's phone (Activation # 734).  During this conversation, BEST and his mother discussed  the registration and tags for a vehicle registered to CAROLYN BECTON. The tags and registration had expired and could not be renewed due to over $1000 of tickets which DEBORAH JONES got while driving the vehicle.[1]  Investigators believe ths conversation confirms that CAROLYN BECTON has at her home paperwork related to vehicles used by Deborah Jones and Willie Best.

98.    On January 28, 2006,  at 8:56 p.m., WILLIE BEST received an incoming call

---

[1]    Your affiant knows that in October of 2004, DEBORAH JONES  and WILLIE BEST were arrested in North Carolina,  along with BEST's cousin,  after a traffic stop yielded four kilograms of powder cocaine.  The charges against BEST AND JONES were dismissed without prejudice.  Your affiant also knows that in January 2004, BEST and JONES were arrested in the District of Columbia and charged with Possession with Intent to Distribute Crack Cocaine.  That case was no-papered.

from CAROLYN BECTON at telephone number (XXXXXXXXXXXXXX.  During  this

intercepted conversation, BECTON and  BEST were discussing a fight that had started on

XXXXXXXXXXXX, SE earlier in the evening involving CAROLYN BECTON, SHANNON

BEST and CHARISMA BEST.  CAROLYN BECTON told BEST she was trying to get the kids

out of the house since the individuals they were fighting with said they were going to come back

and burn the house down. BECTON told BEST that "SHANNON pulled everyone off of

XXXXXX Place on this side, and that everyone was here, off of XXXd Street, as well as XXth

Place to fight."

99.    As noted above, investigators received authorization to intercept the

communications of James Becton on April 3, 2006 for telephones

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.

        a.      On  April 6, 2006, an outgoing call was intercepted from BECTON's

telephone to CAROLYN BECTON's telephone number (XXXXXXXXXXXXX (Activation#

597).  During this conversation, CAROLYN BECTON told JAMES BECTON that he got

something in the mail the previous day from a loan company;   that it was a big package and he

needed to fill out some papers for the new house. BECTON told his mother not to open any more

of his stuff, since she ended up losing it.  Your affiant knows from other authorized interceptions

that BECTON had applied for a loan in connection with a purchase of a $400,000 home.  Your

affiant also knows that BECTON was not employed at the time and did not have any legitimate

income that would qualify him to obtain such a loan.

        b.      On April 24, 2006, an outgoing call was intercepted from BECTON's

telephone to CAROLYN BECTON's  phone (Activation# 5019).  During this conversation,

BECTON asked his mother if she would switch his phone. She said she had to switch out one of her daughter's phones as well, and agreed to do it later that evening.

100.    On May 23, 2006, a series of search warrants were executed. One of those locations was XXXXXXXXXXXXXXXXX, SE, Washington DC, the residence of CAROLYN BECTON .  Found in the home at the time of the search warrant was CAROLYN BECTON. Found in the home at the time of the search were documents pertaining to both WILLIE BEST and JAMES BECTON.

101.    Furthermore, as stated above, confidential source S-1 has recently stated that ROBERT CHASE, and several others, were complaining as recently as May 2007 that JAMES BECTON, also known as  Pumpkin, also known as  P, also known as  Funk, was charging "top dollar" for  "bad quality crack," or "junk." CHASE told S-1 as recently as May 2007 that there was a shortage of crack on Fourth Street, SE, and "Pumpkin [JAMES BECTON] was the only one who had anything to sell."

102.    Based on all of the above, your affiant submits that there is probable cause to believe that evidence and instrumentalities of the crimes described above, specifically documentation in the names of JAMES BECTON and WILLIE BEST, continue to be contained/secreted at XXXXXXXXXXXXXXXXX, SE, Washington, D.C.

**B.     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, Washington, D.C. (Stash House)**

(1).    Description of the Premises

103.    The premises located at XXXXXXXXXXXXXXXXX, SE, Apartment #1, Washington, D.C. (First Court) is described as a multi-family dwelling (apartment building)

located in the first court on the right side of XXXXXXXXXXXXX, SE, after you cross

Chesapeake Street, SE.  Building XXXX is located on the right side of the court as you enter.

The building is a two story brick structure, with brown trim. The building has a concrete

sidewalk with brown metal rails leading to the entrance of the building. The entrance has a brown

metal roof with brown columns over the doorway. A white sign with the number "XXXX" is

affixed on the front of the entrance and can be seen from the parking lot. The front door (lock

out) of the building is brown metal with  a plate glass window and a silver metal handle. The

apartment is located on the first floor and has a brown door with the numeral "1" on the knocker.

(2).    <u>Connection of Conspirators to Address and Probable Cause</u>

104.    Throughout the periods of court ordered interception, your affiant became aware

of a location referred to as "the first court," located in the 4200 block of Fourth Street, SE.,

accessed and utilized by JAMES BECTON, WILLIE BEST, KEITH SAMPLER, RUBIN

BUTLER, CHRIS BECTON, JAQUAN BEST, and ANTHONY HYMAN,  and other members

of this criminal organization.  Based on information previously provided to the government,  S-1,

S-2 and a confidential source advised your affiant  that BECTON and BEST utilized an

apartment in the first court that had been leased for some time by a female relative of the

BECTON/BEST family.

105.    In March of 2006, and on March 29, 2007, a review of the resident directory

records for the apartments located in the Southern Hills complex, located in the XXXX block of

XXXXXXXXXXXXX, SE,  showed a Markinda Faison as the listed tenant for

XXXXXXXXXXXXXStreet, SE, Apt.  Your affiant knows that the BECTON/BEST family are

related to the FAISON family. On May 18, 2007, investigators assigned to this investigation,

confirmed with the property management company, Winn Management, that resident records for XXXXXXXXXXXXXXXXXXX, SE, Apartment #1, still reflected Markinda Faison as the listed tenant.

106.    In late April of 2006, a series of search warrants were planned for a number of locations related to BECTON and other members of this criminal organization, to include 4203 Fourth Street, SE, Apartment #1.  The search warrants were originally planned for May 1 or May 2, 2006, but were postponed when co-conspirator MIAH JACKSON contacted BECTON's mother and advised her that the police planned to conduct search warrants on several apartments located along XXXXXXXXXXXXXXXSE, to include the apartment in the first court.  On April 30, 2006, CAROLYN BECTON contacted JAMES BECTON and told him to get everything out of there, as the police were coming first thing in the morning. In a subsequent intercepted conversation, BECTON contacted an unknown male via Direct Connect to see if "them peoples," an obvious reference to the police,  had taken any action..

107.    On May 23, 2006 a series of search warrants were executed. One of those locations was XXXXXXXXXXXXXXX, SE, Apartment 1.  Inside the apartment investigators located razor blades and a plate which were tested by the Drug Enforcement Administration laboratory and confirmed the residue found on them contained cocaine base, or crack cocaine. Additionally, investigators found 2 rounds of loose .380 caliber ammunition, a receipt in the name of JAMES BECTON and a pillow with miscellaneous writing believed to be a tribute to CARDARIUS BECTON, the younger brother of JAMES BECTON and WILLIE BEST who was shot and killed in May of 2006.

108.    As noted above, investigators received authorization to intercept the

communications of James Becton on April 3, 2006 for telephones

(XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.

  a.  On April 6, 2006, an outgoing call was intercepted from the target

telephone (XXXXXXXXXXXXX, utilized by BECTON to

(XXXXXXXXXXXXXX(Activation# 722). During this conversation with a female known only

to investigators as JANELLE LNU,  BECTON was also intercepted utilizing his Nextel phone

(XXXXXXXXXXXXX, via the "Direct Connect" feature, advising that he, too was in the first

court, and he wanted to know who had the key, that he was about to exit his vehicle.

  b.  On April 8, 2006, an incoming call was intercepted from telephone

number (XXXXXXXXXXXXX, utilized by JANELLE LNU, to target telephone

(XXXXXXXXXXXXX (Activation# 1142).  During this conversation, JANELLE asked

BECTON if he had "that," and asked where he was so she could "get a little something."

BECTON told her to meet around Fourth, in the first court, where they were last night.

  c.  On April 8, 2006, an outgoing call was intercepted from the target

telephone (XXXXXXXXXXXXXto (XXXXXXXXXXXXX (Activation# 1154).  During this

conversation, BECTON and an unknown male discussed going to the "other court" and hooking

up with an unknown female who was in the first court and to see what she wanted.  BECTON

also asked LIPS if those "other joints, not the vitamins, were all ready, already." Your affiant

believes that "those other joints" was a reference to crack cocaine, and the vitamins was a code

word for ecstacy.  BECTON was also overheard to say that both BUSTER and LIPS were in the

first court.

  d.  On April 8, 2006, at approximately 11:48 a.m., your affiant learned that a

70

champagne color four door Lincoln Navigator, bearing Maryland tag, XXXXXXXX, was parked

in front of XXXXXXXXXXXXXXXXXX, SE, Washington, D.C. This vehicle was unoccupied,

but your affiant, as well as other law enforcement personnel have observed JAMES BECTON

driving this vehicle, and have observed this vehicle parked in front of BECTON's residence at

XXXXXXXXXXXXXXXXXXXX, District Heights, Maryland.

   e. On April 10, 2006, an outgoing call was intercepted from target telephone

(XXXXXXXXXXXXXXXXXXXXXXXXXXXXX (Activation# 1559) .  During this

conversation, BECTON discussed an upcoming trip to Disney World. BECTON could also be

heard on his Nextel (target telephone (XXXXXXXXXXXXX. BECTON "clicked over" to

another call, where an unknown male told BECTON he wanted "that" tonight. BECTON told

him that if he wanted it tonight, he could get it, and that BECTON would soon be in the first

court. In the background, BECTON was overheard talking to unknown individuals about the

color of bags, and the color yellow. BECTON also stated that BUSTER needed to stop spending

BECTON's money and wanted to know if BECTON's money was in order.

   f. On April 19, 2006, an outgoing call was intercepted from target telephone

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX (Activation# 4112). The interception

of wire communications to and from this telephone is ongoing. During this conversation,

BECTON and his wife, GINA TAYLOR BECTON were discussing the titles to several vehicles.

BECTON "clicked over" to another call and was also overheard talking to KEITH SAMPLER on

the Nextel phone (XXXXXXXXXXXXX, via the Direct Connect (Push to Talk)  feature.

SAMPLER told BECTON he was in the first court with BUSTER and LIPS. BECTON told

SAMPLER he was coming through since he needed to get $100.00 to put in a bank account of

one of his baby's mothers.

       g.     On April 6, 2006, an incoming call (via Direct Connect) was intercepted to target telephone (XXXXXXXXXXXXX, hereinafter referred to as "BECTON's Nextel phone." During this activation, (Activation# 418), an unknown male told BECTON he had the key and was in the first court. BECTON told the unknown male that he, too was in the first court and that he would be out of his car shortly.

      109.    In April of 2007, S-1 advised your affiant that BECTON was once again utilizing XXXXXXXXXXXXXXXXXX, SE, Apartment #1 to stash quantities of drugs. S-1 stated that ANTHONY BEST, also known as ANT, and the older brother of WILLIE BEST, was currently residing in XXXXXXXXXXXXXXXXXXXX, Apartment 1, and S-1 had observed ANTHONY BEST going in and out of Building XXXX. S-1 stated this apartment was the same apartment that was searched in May of 2006. S-1 has also observed JAQUAN BEST and ANTHONY HYMAN, co-conspirators of JAMES BECTON, going in and out of 4203 4th Street, SE, as recently as May 5, 2007. S-1 stated that neither JAQUAN BEST or ANTHONY HYMAN live on 4th Street, SE. Your affiant knows that information provided by JAQUAN BEST to the U.S. Court Services and Offender Supervision Agency for the District of Columbia (CSOSA) indicated he did not maintain a residence on XXXXXXXXXt, SE, Washington, DC. Additionally, information provided by HYMAN to the Maryland Division of Parole and Probation, indicated HYMAN maintains a residence in Maryland.

      110.    On May 12, 2007, a confidential source, who has been providing reliable and truthful information to the government since August of 2004, advised investigators assigned to this investigation that ANTHONY BEST, also known as ANT, was living in an apartment in the

first court.  This source stated the apartment was one "that had been in the family for years."
Your affiant notes the records of Winn Management reflect Markinda Faison as the listed tenant
dating back to 2000.

111.    During the week of May 1, 2007,  S-1 stated that on at least two occasions,
individuals known to S-1  approached  JAMES BECTON for the purpose of purchasing drugs in
the pit.  On both occasions, BECTON directed these potential buyers to JARON EVANS, also
known as "LIPS."  S-1 stated that due to KEITH SAMPLER's incarceration,  BECTON  had
turned over  much of  the day to day drug sales of this criminal organization to EVANS.  EVANS
is  described as a black male, approximately 21 years of age, whose grandmother lives at XXXX
XXXXXXXXXXXXXXXX Apartment #XXX, across the street from the first and second
courts.  Based on previously intercepted conversations as set forth above, your affiant knows that
EVANS has had the key as well as access to XXXXXXXXXXh Street, SE.

112.    Based on all of the above, your affiant submits that there is probable cause to
believe that  evidence and instrumentalities of the crimes described above are contained/secreted
in the apartment located at XXXXXXXXXXXXXXXXXX, SE, Apartment 1, Washington, D.C.,
located in the first court.


C.    **XXXXXXXXXXXXXXXXXX, S.E., Washington, D.C. Apartment # 3 (Stash
House)**

(1).    Description of the Premises

113.    The premises located at XXXXXXXXXXXXXXXXXX SE, Apartment #X
Washington D.C; described as a red brick,  multi-level, multi-family dwelling located in the

73

second court, in the

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX is the first

building on the right as you enter the court from Fourth Street,  SE. The numerals "XXXX" are

posted above the front entrance door of the apartment building itself with black colored numbers

affixed to a white placard.  Apartment number 3 has a brown door with the number "3" in black

on the door.

(2).    <u>Connection of Conspirators to Address and Probable Cause</u>

114.    The resident rent roll records were checked with the management office on May

18, 2007 and they reflected that BERNARD BRIGGS continues to lease Apartment #3 at

XXXXXXXXXXXXXXX SE.  A check of the records maintained  in the Washington Area Law

Enforcement System (WALES) revealed that BERNARD BRIGGS, aka FATS, aka HEAVY,  is

a  Black Male, 5'8", 375 lbs.   A confidential source who recently began cooperating with the FBI

advised  that on numerous occasions, it has observed LIPS, SON SON, (KEITH SAMPLER),

"P," (JAMES BECTON), JAMAL (JAMAL RAMSEY), and DRE (JOHNNY HODGE),  in the

hallway of XXXX; on the front steps of XXXX, and in Apartment #3 , often when police enter

the second court. This source stated that the people that hang in  Building XXXX are associated

with JAMES BECTON. This source also stated that FATS, or HEAVY,  lives on the first floor

of this building. The source described this individual as a black male in his forties, weighing

more than 300 pounds. The information provided by the source has been corroborated by

independent investigation.

115.    As noted above, investigators received authorization to intercept the

communications of James Becton on April 3, 2006 for telephones

(XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.

a.      On April 10, 2006, an outgoing call  was intercepted from target telephone (XXX) XXXXXXXX to telephone number (XXXXXXXXXXXXX (Activation #1373).  During this conversation, BECTON asked an unknown male who was on Fourth Street last night. BECTON wanted to know how business was in the apartment? The unknown male told BECTON that "HEAVY almost got everybody 100 years last night."  BECTON wanted to know what happened? The unknown male told BECTON that HEAVY had opened the door for the "feds," (police)  and the "feds" said they were going to bring the white shirts (Agents). BECTON said, "hey, I say smack the goddamn ass shit on his ass."

b.      On April 13, 2006, an incoming call was intercepted via Direct Connect from XXXXXXXXXXXXXXX to the target phone (Activation #1159). During this conversation, BECTON asked where SON SON was. An unknown male told BECTON that SON SON was on HEAVY's phone. BECTON told the male that he had forgotten the male needed "plant and shit."  The unknown male told BECTON he would call him as soon as he got up.

c.      On April 15, 2006, an incoming call was intercepted from telephone number (XXXXXXXXXXXXX to target telephone (XXXXXXXXXXXXXX(Activation # 2719).  During this conversation, BECTON questioned BUSTER as to if he had sold all of his drugs, then why did he not have BECTON's money?  BUSTER told BECTON that some of the people he had sold to still owed him money. BECTON asked BUSTER what did I tell you about that the first time? BECTON told BUSTER he was sending him back out to get the money with some others who were distributing drugs for him. He asked BUSTER for a phone number, and

BUSTER told BECTON his phone was in HEAVY's house.

       d.    On April 25, 2006, an outgoing call was intercepted from target telephone (XXXXXXXXXXXXX via Direct Connect to XXXXXXXXXXXXX (Activation #  2444). During this conversation, BECTON asked an unknown male where he was. The male replied he was about to go into HEAVY's house and watch the game. BECTON asked the male "where LIPS was at?" The unknown male told BECTON that LIPS was right there. BECTON told the unknown male to ask him what's good?

116.    On April 27, 2006,  your affiant learned that officers from the Metropolitan Police Department "jumped out" in the second court. S-7 observed several individuals run into HEAVY's apartment when the police came into the court. The individuals that ran into HEAVY's apartment included KEITH SAMPLER aka Son-Son and LIPS.  Interceptions have confirmed that SAMPLER and LIPS are narcotics co-conspirators of BECTON and BEST.

117.    On May 23, 2006 a series of search warrants were executed. One of those locations was XXXXXXXXXXXXXXXXXX SE, Apartment #3 Washington D.C; .  Inside the apartment investigators located a crack pipe, a gin bottle which investigators believe was utilized to smoke crack cocaine, a scale used to weigh cocaine,  0.15 grams of cocaine base and a memorial paper for CARDARIUS BECTON, the younger brother of JAMES BECTON and WILLIE BEST who was shot and killed in May of 2006.  The Drug Enforcement Administration, Mid-Atlantic Laboratory determined the white residue on the scale to be cocaine base, also known as crack cocaine and also confirmed the 0.15 grams of suspected crack was in fact cocaine base.

118.    On March 14, 2007 your affiant knows that RUBIN BUTLER, a co-conspirator of

JAMES BECTON and WILLIE BEST was taken into custody in the

XXXXXXXXXXXXXXXth Street, SE for an outstanding arrest warrant.  BUTLER was taken

into custody just after exiting a vehicle which was later determined to belong to JAQUAN BEST.

In BUTLER's pocket investigators found a small bag of marijuana.  Just prior to entering BEST's

vehicle, which was un-occupied at the time, BUTLER was observed by investigators exiting

building XXXXXXXXXXXXXXX, SE.  Subsequent to the arrest, investigators knocked on the

door of XXXXXXXXXXX Street SE, Apartment #3 and asked for BUTLER's jacket, which the

occupants provided.

119.    On April 6, 2007 members of the Seventh District Focus Mission Unit executed a

DC Superior Court Narcotics Search Warrant at XXXXXXXXXStreet, SE, Apartment 3,

Washington, DC.  Inside the apartment the Officers located BERNARD BRIGGS, PHILLIP

HOBBS and TYRONE WASHINGTON, a narcotics co-conspirator of BEST and BECTON.

Inside the apartment the officers recovered 2 crack pipes, numerous empty ziplock bags, 2 empty

ziplock bags with suspected cocaine residue, a digital scale, one ziplock bag containing a

greenish weed substance, a digital scale and $662.00 in U.S. currency.  Both WASHINGTON

and BRIGGS were charged with Possession of Drug Paraphernalia and HOBBS was charged

with UCSA Possession of Marijuana.

120.    During the first week of May, 2007 S-1 observed TYRONE WASHINGTON and

CHRIS BECTON conducting hand to hand sales of crack cocaine in the hallway of building

4217.  S-1 stated that when co-conspirators such as TYRONE WASHINGTON and CHRIS

BECTON are conducting hand to hand narcotics sales in the hallway of 4217 4th Street, SE, they

utilize apartment 3 as a safe haven to escape from police if they attempt to enter the building.

121.    Based on all of the above, your affiant submits that there is probable cause to believe that  evidence and instrumentalities of the crimes described above are contained/secreted in the apartment located at XXXXXXXXXXXXXXXXXXX, SE, Apartment #3, Washington, D.C., located in the second court.

**D.    XXXXXXXXXXXXXXXXXXXXXXXXX., Apartment C, Washington, D.C.**

(1).    Description of the Premises

122.    The search site is located in the Royal Courts Apartments.  It is described as a multi-family, two-story dwelling with multi-colored vinyl siding (light green, tan and pink). The building is trimmed in white, the lower level is brick, and the top has vinyl siding.  The numbers "XXXX" are affixed to the front of the building on Second Street.  Apartment C is located on the second level of the building and the second level is accessible by wood steps with a green metal railing and white support columns.  Apartment C is also located in the far left corner of the second level and it has a red door.  The numbers "XXXX" are positioned on the apartment's door under the peephole and the letter "C" is affixed above the peephole for the apartment door.

(2).    Connection of Willie Latrell Best to Address

123.    A review of the records of AutoTrack database reflect that WILLIE J. BEST is associated with 3819 Second Street, S.E., Apartment C, Washington, D.C. with a telephone number of (XXXXXXXXXXXXX.  The indicated phone number and address were verified via Autotrack based on current phone listings. The affiant's investigation has further revealed that WILLIE J. BEST, also known as "Teeny Man," is WILLIE LATRELL BEST's father.  As stated above, WILLIE LATRELL BEST and JAMES BECTON are the leaders of the narcotics conspiracy described herein.

78

124.    Between January 27, 2006, and March 27, 2006, law enforcement personnel conducted extensive surveillance on Willie Latrell Best and other members of his conspiracy and during this time period agents or officers observed Best at or outside his father's Second Street residence on at least three different occasions.

125.    In early May of 2007, a confidential source observed WILLIE LATRELL BEST in front of XXXXXXXXXXXXXXXXX, SE, Washington, D.C., the residence of CAROLYN BECTON. The source observed a burgundy and white pick up truck parked in front of XXXXXXXXXXXXXXXXXXXXXX, which WILLIE LATRELL BEST referred to as his work truck.

126.    On May 18, 2007, WILLIE LATRELL BEST was observed exiting Apartment C, 3819 Second Street, SE, Washington, D.C. and entering a burgundy pick up truck with a white utility cab over the pick up bed, bearing Maryland tag XXXXXX. A review of the automated files of the Maryland Department of Motor Vehicles reflect the owner of this vehicle as DKS Climate Control, XXXXXXXXXXXXXXXXXXXHyattsville, Maryland, 20781. Analysis of pen register information of BEST's cellular telephone (XXXXXXXXXXXXX, reflect 171 calls between BEST's phone and the telephone of DKS Climate Control at XXXXXXXXXXXXXX

127.    Activation #135

On January 27, 2006, at approximately 5:58 p.m., WILLIE LATRELL BEST received a call from TRACEY BEST. During this call, BEST, among other things, told TRACEY BEST that he was going to be in "southeast" at his "father's house," and that she could come through as soon as they come in.

Investigators believe that during this call Best informed his wife that he would be at his father's house, which is located at XXXXXXXXXXXXXXXXXX, SE, Apartment C, Washington, D.C.

128.    <u>Activation #1564</u>

On February 1, 2006, at approximately 9:40 a.m., JAMES BECTON called WILLIE LATRELL BEST. BECTON told BEST he was at his house, and for BEST to come on through. BEST also told BECTON he needed a ride, BECTON asked him where he was at, and he informed BECTON he was at Teeny Man's house. BECTON told BEST he would call him when he came out. Your affiant knows, based upon this investigation and base upon discussions between investigating agents and S-2, that "Teeny Man" is a nickname for "Willie J. Best" who lives at XXXXXXXXXXXXXXXXXX, S.E., Apartment C, Washington, D.C.

129.    <u>Activation #1664</u>

On February 1, 2006, at approximately 6:03 p.m., CAROLYN BECTON called WILLIE LATRELL BEST who told her he was on Teeny Man's line. CAROLYN BECTON told BEST to tell Teeny Man to call her when BEST got off his phone.

Investigators believe that during this call Best told Becton that he was talking on another telephone phone line, that is, his father's telephone at the Second Street, Southeast, residence.

130.    <u>Activation #2394</u>

On February 24, 2006, at 3:51 p.m., FRED MERCER called WILLIE LATRELL BEST and wanted to know where BEST was at. BEST told MERCER, "I just told you, I am at my father's house." MERCER told BEST he was about to pull up in five minutes.

Investigators believe that this call further demonstrates that Best maintains residence at

his father's home on Second Street, Southeast.

131.    Investigators have recently observed BEST at the XXXXXXXXXXXXXXX, SE location.  On March 6th, 7th and the 13th, 2007, investigators observed WILLIE LATRELL BEST and a child, believed to be his daughter, exiting XXXXXXXXXXXXXXX, S.E., Apartment C, Washington, D.C., on each of those three days at approximately 7:30 a.m.

132.    On March 28, 2007 your affiant observed DEBORAH JONES a co-conspirator of WILLIE LATRELL BEST outside of XXXXXXXXXXXXXXX, SE.  BEST exited Apartment C, met JONES in front of the apartment and left together in JONES' vehicle.

133.    On April 28th, 2007 your affiant observed a vehicle known by your affiant to belong to MIAH JACKSON, a co-conspirator of BEST's parked in front of XXXXXXXX Street, S.E., Apartment C, Washington, D.C.

134.    On May 18, 2007, a law enforcement officer observed WILLIE LATRELL BEST exiting XXXXXXXXXXXXXXX, S.E., Apartment C, Washington, D.C., between approximately 7:30 and 8:00 a.m., and entering the maroon pick up truck described above in paragraph 126.

3.    Probable Cause as to Willie Latrell Best

135.    Willie Latrell Best, like his brother James Becton, are leaders of a drug trafficking network that distributes drugs, to include cocaine, in the XXXX and XXXX blocks of XXXXXXXXXXXXX, Southeast, D.C.  Moreover, based upon several intercepted conversations, your affiant believes that BEST resided at, lives at, or maintains regular contact with the XXXXXXXXXXXXX, SE, address and, as such, he – as a drug trafficker – stored or maintained records at the Second Street residence.  In addition to previously identified

intercepted communications, these conversations include:

136.    Activation #2468

On February 24, 2006, at approximately 7:43 p.m., WILLIE LATRELL BEST received a telephone call from telephone number (XXXXXXXXXXXXX.  During this call, an individual who identified himself as REGGIE called BEST and asked him for directions to where he [BEST] was at.  REGGIE also told BEST he was "by Chesapeake" and BEST told him to come down Fourth Street SE to Mississippi Avenue, SE.  BEST then told him to "come down to the next light and make another left, then right on Second" and that he [BEST] was right there on the corner.

Investigators believe that during this call Best provided a customer the directions to his residence so he could sell the customer a quantity of illegal narcotics.  Furthermore, this conversation is significant because the Royal Court Apartments are located at the corner of Second Street, and Mississippi Avenue, SE., XXXXXXXXXXXXXXXXXXXXXXXXX., ApartmentXX, is located in the complex, and Best gave Reggie, a customer, directions to this location.

137.    Activation #3507

On February 9, 2006, at 6:20 p.m., SHANIKA BECTON  attempted to relay  (three way) a conversation between her two brothers, SHAWN BEST and WILLIE BEST. During this call, BEST told his brother to call him tomorrow on Teeny Man's phone. Through SHANIKA, SHAWN told BEST that he could not call BEST at Teeny Man's house tomorrow since he did not have enough money left on his phone.

Investigators believe that Best's request that Shawn Best call him at his father's home

(Teeney Man's home) further establishes Best's relationship to, or connection with, the Second Street residence and, as such, the likelihood he would maintain drugs or documents related to drug trafficking there.

138.   Activation #7340

On February 28, 2006, at approximately 5:30 p.m., WILLIE BEST received a call from telephone number (XXXXXXXXXXXX.  This number is subscribed to by THERESA LONG, 10404 Idaho Place, Upper Marlboro, Maryland, 20774.   During this call a person believed to be THERESA LONG told BEST she "was on Mississippi" and he told her to"come down Second Street [and] make the right and come to XXXX."

Investigators believe that during this call Best intends to meet a customer and provide her with illegal narcotics.  This call is also significant because it connects the Second Street residence to Willie Latrell Best.

139.   Activation # 7344

On February 28, 2006, at approximately, 5:36 p.m.,WILLIE BEST received another call from LONG, who asked BEST what door was the apartment.  During this call, BEST told LONG it was a red door.

Investigators believe this call was significant since it identified the exact apartment that BEST was referring to.

140.   Activation #14820

On January 13, 2006, at approximately 1:22 p.m., FRED MERCER called WILLIE BEST. During this call, BEST told MERCER he had been trying to call him all night, and MERCER said he was at Tony's joint. BEST wanted to know how long MERCER was going to

be at that location, and MERCER said not too long. BEST told MERCER he was at his father's

house. MERCER asked BEST if his father was at home, and BEST told him no. BEST then told

MERCER that he was "fucked up" since his one year old son Gavin had eaten a "piece of cookie"

last night. BEST told MERCER "hear what I am telling you...he ate a piece of a cookie last

night." MERCER told BEST, "I hear you, but I hope I am not hearing you." BEST told

MERCER to come on through.

Investigators believe that during this call BEST told MERCER that his son had eaten

some crack cocaine and he [BEST] was upset about it. This call is also significant because it

demonstrates that BEST had stored and distributed crack cocaine from his father's address and

his young son got some of it.

141.    On May 23, 2006, a series of search warrants were executed. One of those

locations was XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, Washington,

D.C.  Inside the apartment investigators located, among other items, $1000.00 U.S. Currency, a

.38 caliber revolver, 16 loose rounds of .38 caliber ammunition and dog papers which

investigators believe to be the lineage of pit bulls BEST breeds for dog fighting ventures.

142.    On May 18, 2007, a review of the FBI's automated telephone applications

database revealed that WILLIE LATRELL BEST'S cellular phone (XXXXXXXXXXXXX) had

been in contact as recently as March 3, 2007, with the telephone of a known drug trafficker being

investigated by the FBI.  The review has indicated ten such contacts in March 2007.  The

individual with whom BEST has been in contact, in addition to being a known drug trafficker, is

known to also be involved in dog fighting ventures.  Based on information previously provided

by S-1 and S-3, and a number of intercepted phone calls, your affiant knows Best is involved in

illegal dog fighting ventures.

143.    Based on all of the above, your affiant submits there is probable cause to believe that evidence and instrumentalities of the crimes described above, in particular documents and records, are contained/secreted in the residence at

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, Washington, D.C.


### E.    **XXXX XXXX Street SE, Washington, DC**

(1).    Description of the Premises

144.    The search site is described as a multi-level, multi-family dwelling with an all brick exterior  There is a concrete sidewalk which leads to a set of exterior stairs, which lead to the second floor of the structure.  The sides of the stairs are constructed of red brick.  The door at the top of the stairs is dark yellow.  The number "XXXX"  is black with a white background and runs diagonally down from left to right and clearly displayed in the center of  the door.

(2).    Connection of Robert Chase to the premises:

145.    On Sunday May 12, 2007 S-1 indicated that ROBERT CHASE was currently living with his sister, Helen Chase, at XXXX XXXd Street SE, Washington, D.C.  In March of 2006 investigators obtained a tenant list which indicated that the primary lease holder of XXXX XXnd Street SE, Washington, D.C. was Helen Chase.  Additionally, on May 14, 2007 investigators confirmed with the leasing office that Helen Chase continues to lease

XXXXXXXXXXXXXXXXXXXX, Washington, D.C.

(3).    Probable Cause as to Robert Chase.

146.    Activation #14

On January 27, 2006, at approximately 1:20 p.m., WILLIE BEST called ROBERT CHASE. CHASE said that they got "Wop" (JAQUAN BEST) last night in Maryland on his way home. BEST and CHASE then discussed JAQUAN BEST and WILLIE BEST received a call on call waiting. When BEST returned to CHASE he asked CHASE what he was looking like and CHASE replied he was ready. BEST said he was on his way to him.

Investigators believe in this call BEST is contacting CHASE to see if he is ready to receive more drugs. When CHASE says he is ready, BEST says he is on his way.

147.  Activation # 1830

On February 2, 2006 at approximately 3:20 p.m., WILLIE BEST spoke to ROBERT CHASE and asked him if he was asleep. CHASE says he was just getting up. BEST wanted to link up with him early and get him out of the way early so he didn't have to be out late. CHASE said that would be good. CHASE then indicated he was ready for BEST. BEST asked how CHASE was on the other end though. Chase said same thing, half a steak and cheese. Best asked if wanted onions and tomatoes on that shit too. Best said alright, he would be about 15 minutes.

In this call investigators believe that BEST wants to stop and drop off drugs to CHASE early in the evening. CHASE says he wants the same thing, "half a steak and cheese" which investigators believe is a reference to an amount of drugs. BEST says alright and that he will be there in 15 minutes.

148.  Activation # 4568

On February 14, 2006 at approximately 10:37 p.m WILLIE BEST called ROBERT CHASE. CHASE said damn dog that's fucked up. BEST said that shit ain't been me it just been

86

on hold like that.  CHASE said what's going on now though.  BEST replied "man come on

through whenever your ready, whenever you get on this side."  CHASE  said where on 4th?

BEST said don't scream no joints.  BEST wanted to meet him where he "always told him to meet

him."  BEST  asked CHASE  if he understood and CHASE said no.  BEST said to meet him right

there where he always told him to meet him at. When CHASE realized where BEST wanted him

to meet him, BEST then instructed him to call him when he gets there.

      Investigators believe that in this call BEST is telling CHASE that it is not his fault that it

is taking him so long to get the drugs, BEST's supplier is the hold up.  BEST then indicated he

had some drugs and tells CHASE to come through to pick it up.  When CHASE said 4th he

meant on 4th Street, SE,  BEST was upset that CHASE mentioned the location of the meet.

BEST then attempts to use code to get CHASE to what he considered their normal meet location.

      149.    Activation # 6640

      On February 25, 2006 at approximately 11:02 p.m. WILLIE BEST received an incoming

call from ROBERT CHASE.  BEST said that CHASE must be cussing him.  CHASE said no.

BEST said he spoke to him this morning and he still had not come.  BEST said he just now spoke

to him and thought he would call and let him know.  BEST said it isn't him (BEST).  BEST said

he needs to meet CHASE and grab some ones from him real fast. CHASE said he hadn't been

out, he was waiting..  BEST said OK, he will catch up with him later and then he asked CHASE

if he could get anything.  CHASE said he could handle something small.  BEST said he will

catch up with him later.

      Investigators believe that in this call, BEST begins by apologizing because he is waiting

on his drug connection.  CHASE said that it was alright.  BEST says he wanted to pick up some

"ones" which investigators believe to be money.  CHASE said he hadn't been out because he has

been waiting.  BEST asked if he could get anything and CHASE says he could probably handle a

small amount of drugs.  BEST said he would try to catch up with CHASE meaning to supply

him.

      150.   <u>Activation # 8786</u>

_____On March 7, 2006, WILLIE BEST called ROBERT CHASE and said he was hard to

catch up with.  CHASE said he needed a couple of days.  BEST said that was cool he just needs

to hear CHASE's voice.  BEST didn't have any room for any "fuck ups."  CHASE said that BEST

is the only one he is looking out for and that he was out there last night. BEST said he doesn't

mind he just needs to hear his voice. CHASE said he had been going out on the day shift fucking

with the little boy.  BEST said he feels him.  BEST said he is family but he has to hear his voice,

he doesn't have room at all.  Things were very tight.  BEST told him to go ahead and catch up

with him later.

     In this call investigators believe that BEST is calling CHASE to try and get money he

owed him for drugs.  BEST said things are very tight for him.  CHASE said he has been looking

out for BEST and only BEST.  CHASE said he had been out in the morning "fucking with that

little boy."  Your affiant knows that "Boy"  is a street term for Heroin.

     151.   <u>Activation # 9066</u>

_____On March 8, 2006 at approximately 5:38 p.m. WILLIE BEST received a call from

ROBERT CHASE.  BEST asked CHASE how he looked, was he holding fast?  CHASE said

"yeah, beginning of the week you know how it is."  BEST said right and to just give me a call

later on.  CHASE said not right now, he should be at least half way that night and then if BEST

wanted to come get it in the morning, whatever, that's cool, then he'll (CHASE) get another one. BEST said he was going to still fuck with him. BEST told CHASE to "just get your shit together he won't start fucking with him just don't fuck up." CHASE said he was the only one who has been looking out. BEST said he had his back. CHASE said OK. BEST said do what you gotta do and BEST will see CHASE later on. BEST said he was still waiting on CHASE.

Investigators believe that in this call, BEST was trying to get money from CHASE which he owed BEST for drugs which had been fronted to him. CHASE said he was half way through what BEST supplied him and BEST could pick up the money for half tomorrow. CHASE said BEST is the only one looking out for him. BEST told him not to make a mistake.

152.  Activation # 10450

On March 15, 2006 at approximately 12:58 p.m. WILLIE BEST called ROBERT CHASE and asked what he was looking like. CHASE said he should have something for him tomorrow and that he didn't go out last night. BEST stated he would try to get with him tomorrow. CHASE said around this time. CHASE then made excuses on why BEST couldn't get in touch with him. BEST said he isn't going to knock on his door until it is the last resort. CHASE made excuses about people putting him on hold. BEST was upset because he came through for him and he didn't see nothing off of that. He had been trying to get CHASE back but now BEST hasn't seen anything. BEST said he felt disrespected and said he couldn't have done any better for CHASE than that. CHASE was already into BEST so he said lets go ahead and get it together and just get back with him and BEST hadn't seen anything. CHASE said he hoped BEST wasn't fucked up like that because he is still was going to need him. BEST said he had bills to pay, he had things to take care of. CHASE said people have him on hold, he said it is definitely tonight,

he was going out early.  BEST said give him a call.

Investigators believe that in this call BEST is trying to get money from CHASE that CHASE owes BEST for drugs.  BEST couldn't get in touch with CHASE and he is upset that CHASE wasn't trying to get in touch with BEST.  BEST indicated that CHASE owed him money and BEST still came through for him with more drugs to get him back on his feet again.  CHASE indicated the he was going out early, which investigators believe he means going to 4th Street, SE to sell drugs, and that he should have some money for BEST by the next day.

153.    S-1 has observed  ROBERT CHASE on 4th Street SE conducting street level narcotic sales, as recently as May 5, 2007.  As stated previously,  S-1 stated that CHASE, along with several other individuals, were complaining in early May 2007 that JAMES BECTON was charging "top dollar" for "bad quality crack" or "junk." CHASE told S-1 that there was a shortage of crack on Fourth Street, SE, and that "Pumpkin was the only one who had anything to sell ." BECTON was charging high prices for bad stuff and CHASE and others were complaining.

154.    S-1 stated that CHASE normally leaves 4th Street, SE and returns to 3519 22nd Street, SE, Washington, D.C. early in the morning.

155.    Based on all of the above, your affiant submits there is probable cause to believe that evidence and instrumentalities of the crimes described above are contained/secreted in the residence at 3519 22nd Street SE, Washington, D.C.

**F.    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, Washington, D.C.**

(1).    Description of the Premises

156.    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, Washington,

90

D.C. is described as a multi-family, multi-story dwelling with red brick exterior construction. The windows of the lower floors have black security bars over them. The building is positioned perpendicular to the road with the front entrance accessed by a concrete sidewalk which leads from the road to the front entrance. On the side of the building closest to the road the building number "XXXX" is clearly displayed with white numbers on a blue background. The front door to the building is a brown in color with a large window. There is a brown metal awning located over the front door. The rear door is also brown with a large window. Over the rear entrance is a brown metal awning. When entering the building through the front door there are approximately 3 steps up and apartment 101 is located on the left. There are no numbers indicating which door is 101 and 102 is directly across the hallway from 101. The door to apartment 101 is of metal construction and brown in color.

(2).    <u>Connection of Johnny Hodge to Address</u>

157.    On July 7, 2006, JOHNNY HODGE was interviewed by agents of the Federal Bureau of Investigation and provided a home address of 2646 Birney Place, SE, Apartment 101, Washington, D.C.

158.    HODGE also provided the U.S. Court Services and Offender Supervision Agency for the District of Columbia a home address of XXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, Washington, D.C. Probation Officers from the U.S. Court Services and Offender Supervision Agency for the District of Columbia conducted a mandatory home visit for the purpose of verifying HODGE's home address on May 1, 2007, and determined HODGE does reside at the 2646 Birney Place, SE, Apartment 101 address.

(3).    <u>Probable Cause as to Johnny Hodge</u>

159.    <u>Activation #7841</u>

_____On December 17, 2005 at approximately 9:42 p.m. JOHNNY HODGE called FRED

MERCER and asked him what's going on? MERCER said he was glad HODGE called him and

said them boys , they just left the Second Court.  HODGE said he was about to go over there but

he would go inside the house instead. MERCER told him to hold fast, about 20 minutes, and he

would call HODGE back and tell him what was going on.

Investigators believe that in this call HODGE and MERCER are attempting to meet in the

XXXXXXXXXXXXXXXXXXXXXXXXXX SE, specifically in the 2nd Court.  Due to police

action in the area, HODGE is going to go in the house and MERCER will call him back when the

police leave the area.

160.    <u>Activation # 8915</u>

On December 22, 2005 at approximately 1:59 p.m., FRED MERCER called JOHNNY

HODGE.  HODGE told MERCER he didn't have any minutes on his phone.  MERCER said he

was waiting for HODGE to come through but he didn't hear anything so he went back inside

where he was with his son and his wife.  HODGE said I was waiting for that "shit" to dry.

MERCER said it's all good, I had to arrange it you know what I mean.  HODGE asked MERCER

if he wanted him to take it to the "D."  MERCER said I am with my son and my wife I will be

back out around 3:00.  HODGE said what time is it now.  MERCER replied that it is 1:55.

HODGE said I will meet you around there around 3:00.

Investigators believe that in this call HODGE and MERCER are attempting to meet to

conduct a drug buy.  MERCER waited for HODGE but went inside when HODGE did not show

up to meet him.  HODGE is "cooking" cocaine powder into cocaine base also known has crack cocaine as HODGE comments that he was waiting for the "shit" to dry which is why HODGE could not meet MERCER.  When HODGE suggests the "D", you affiant believes he means for MERCER to meet him at D's Barber shop which is at the corner of 6th Street SE and Chesapeake, approximately 1 block from theXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

161.    Activation #8926

_____On December 22, 2005 at approximately 4:34 p.m. FRED MERCER called JOHNNY HODGE, and MERCER told HODGE he is about to leave out now.  HODGE said I am still in the house doing something and told MERCER to give it to "D" and I will see you later on. MERCER says alright.

Investigators believe that "D" is an associate of both HODGE and MERCER and that MERCER is to give "D" money to give to HODGE for drugs.  During an interview of HODGE, in July of 2006, he stated that he sometimes borrows a BMW from someone known to him as "D."  HODGE also stated that "D" owns D's Barber Shop which he stated was located at the corner of 6th Street SE and Chesapeake.

162.    Activation #9133

_____On December 23, 2005 at approximately 2:36 a.m. MERCER called HODGE and HODGE told him that he sees them and he is in the house.  Investigators believe that HODGE and MERCER are referring to police in the area.

163.    Activation #9134

On December 23, 2005 at approximately 2:37 a.m. MERCER called HODGE and said it is ugly as a motherfucker.  MERCER stated there are four of them in the Taurus joint and it's like

a goddamn marathon out here tonight.  MERCER said I'm right here though I'm about to get out

of here in a minute.  Then MERCER said, he is going to stay out here and let you know.

Investigators believe that in this call MERCER and HODGE are still trying to meet.

MERCER is outside and has seen police in the area.  MERCER is going to stay outside for a

little longer to see if the police leave the area.

164.   Activation #9137

_____On December 23, 2005 at approximately 2:40 a.m. FRED MERCER calls JOHNNY

HODGE and said "they jetted homes" and that MERCER was about to walk over there.  HODGE

said "for real."  MERCER said I'm clean I'm heading over to shorty's house.  MERCER said I

seen them all pull out.  MERCER asked HODGE where he was.  MERCER said he was looking

for them even though he saw them all pull out  and that "I'm trying to make sure they're all gone."

 MERCER told HODGE "we're good I'm out front, come on. come on."  HODGE said he was

coming out.

Investigators believe that in this call MERCER doesn't see any police in the area and that

it is safe for MERCER and HODGE to meet to HODGE can deliver the drugs.

165.   On December 11, 2006, HODGE was sentenced to 1 year supervised probation to

run concurrent with 3 months to be served in a halfway house.  HODGE pled guilty to 3 counts

of UCSA distribution of crack cocaine.

166.   On  May 1, 2007, while conducting surveillance in the 4200 block of 4th Street

SE investigators observed HODGE at the corner of 4th Street SE and Atlantic Avenue in a rental

car.  Investigators then followed HODGE to Birney Place.  HODGE exited the vehicle at which

time investigators observed him meet with and unknown individual.  Investigators them lost sight

of both.  When HODGE returned to the vehicle and began to pull away he was stopped by the

Metropolitan Police Department at the corner of Birney Place and Pomeroy Road, SE.  HODGE

was arrested for operating a vehicle without a license.  Inside the vehicle investigators found 2-3

money orders for approximately $200 each.

167.    During the first week in May 2007, S-1 observed JOHNNY HODGE, selling hand

to hand drug transactions in building XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  S-1

also observed HODGE in the buildings in the XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

on May 12, 2007.

168.    Based on all of the above, your affiant submits there is probable cause to believe

that evidence and instrumentalities of the crimes described above are contained/secreted in the

residence at XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, Washington, D.C.

## VI.    CONCLUSION

169.    Based on all of the above, your affiant submits that there is probable cause believe

that evidence and instrumentalities of the crimes described above are contained/secreted in the

locations as described and set forth above.


_____

Chris Fiorito
Special Agent
Federal Bureau of Investigation


Sworn to and subscribed before me
this _____ day of May, 2007 in
the District of Columbia


_____

UNITED STATES MAGISTRATE JUDGE